## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| **DONNA OWEN**<br>　　　　　**Plaintiff,**<br><br>**v.**<br><br>**GEORGIA PACIFIC**<br>　　　　　**Defendant.** | **CIVIL ACTION NO.**<br>**3:03 CV 378 (DJS)**<br><br><br>**February 23, 2004** |

### PLAINTIFF'S LOCAL RULE 9(c)2 STATEMENT

**1.**　　**Plaintiff was hired as a product manager at Fort James Corporation's Dixie facility in Norwalk, Connecticut in January, 2000. See Deposition of Donna Owen attached as Exhibit A ("Owen Dep.") at 20-21.**

**Response:  Admitted.**

**2.**　　**Plaintiff was an "at-will" employee of Fort James. Owen Dep. at 46, Owen Dep. Ex. 5.**

**Response:  Denied.  Plaintiff claimed implied employment contracts in her Complaint.  Complaint, Counts 1, 2 and 3.**

**3.**　　**Plaintiff s supervisor was Wayne Grant, Director of Marketing. Declaration of Wayne Grant attached as Exhibit B ("Grant Decl.") at 1 3, 4.**

**　Response:  Admitted.**

**4.**　　**Plaintiff was not working for the Company when Mr. Grant was hired or placed in the Director of Marketing position. Owen. Dep. at 210-11.**

**Response:  Admitted.**

**5.**　　**Mr. Grant "was very adept at being a product manager." Owen Dep. at 150.**

**Response:   Admitted but denied that he was adept as a Department Manager. Owen affidavit, 9.**

6.      Mr. Grant was neither unfit nor incompetent in his duties. Owen Dep. at 209.

**Response:   Admitted but denied that he was adept as a Department Manager. Owen affidavit, 9.**

7.      Fort James Corporation, including its Dixie operations in Norwalk, was acquired by Georgia-Pacific in late 2000. Owen Dep. at 21, 142.

**Response:  Admitted.**

8.      Donna Owens was the product manager for the plastics category. Owen Dep. at 45-46.

**Response:  Admitted.**

9.      The plastics category included such products as plastic drinking cups, portion or condiment cups (also called "souffle cups"), and lids. Owen Dep. at 46-47.

**Response:  Admitted.**

10.     As a product manager, Ms. Owen was expected to lead and manage the plastics category. Owen Dep. at 266, Owen Dep. Ex. 20.

**Response:  Admitted.**

11.     One of Ms. Owen's principal job duties included supporting the sales force. Owen Dep. at 41; Owen Dep. Ex. 15, 20 and 22; Grant Decl. 1 4.

**Response:  Admitted.**

12.     The sales managers were Ms. Owen's key internal customers. Grant

Decl. at T 4; <u>see also</u> Owen Dep. at 41.

Response:  Denied.  Plaintiff's deposition testimony stated that she supported the sales force along with production and pricing.  Owen Dep. at 41.

13.    Ms. Owen's job required that she respond to pricing and information requests from sales managers. Owen Dep. at 68-69.

Response:  Admitted.

14.    Ms. Owen had to be knowledgeable about the plastics products that Dixie sold, as well as competitors' products. Owen Dep. at 61.

Response:  Admitted.

15.    Ms. Owen was required to interface with and serve as a clearing house for various groups within the company, including employees responsible for sales, finance, customer service, forecasting, manufacturing, planning, shipping, pricing and product supply. Owen Dep. at 41, 68-70.

Response:  Admitted.

16.    Communication and interpersonal skills were very important aspects of the product manager job. Owen Dep. at 67, 83.

Response:  Admitted.

17.    On or about January 29, 2002, Plaintiff attended a training course entitled Civil Treatment® for Managers. Owen Dep. at 111, Owen Dep. Ex. 8.

Response:  Admitted.

18.    The Civil Treatment® for Managers program was authored by Steven M. Paskoff, Esq., the President of Employment Learning Innovations, Inc. Owen Dep. at 117; Owen Dep. Ex. 9 at 1.

- 3 -

Response:  Admitted.

19.   The Civil Treatment® For Managers program was intended to provide managers with "the knowledge, skills, and understanding they need to manage their jobs in a professional way." Owen Dep. at 117; Owen Dep. Ex. 9 at 1.

Response:  Admitted.

20.   The Civil Treatment® For Managers program provided training for managers on avoiding lawsuits based on discrimination, harassment, wrongful discharge, and other employment claims. Owen Dep. Ex. 9; Declaration of Lori Richman attached as Exhibit C ("Richman Decl.") at T 4.

Response:  Admitted.

21.   Georgia-Pacific required all managers above a certain level to attend the Civil Treatments For Managers program. Richman Decl. at T 5.

Response:  Admitted.

22.   Ms. Owen attended the Civil Treatments For Managers Program because she met the required criteria. Richman Decl. at T 5.

Response:  Admitted.

23.   During the Civil Treatments For Managers training, an instruction manual was distributed to employees. Owen Dep. at 112-13; Owen Dep. Ex. 9.

Response:  Admitted.

24.   The Civil Treatments for Managers manual was authored by Employment Learning Innovations, Inc., and has been customized to include Georgia-Pacific's employment policies (rather than generic policies) where applicable and appropriate. See Owen Dep. Ex. 9 at 6-10.

Response:  Admitted.

25.    Ms. Owen received a copy of this manual during her Civil Treatments For Managers training. Owen Dep. at 112-13.

Response:  Admitted.

26.    The program's title Civil Treatments For Managers was a registered trademark, and the entire instruction manual was copyrighted by Employment Learning Innovations, Inc. Owen Dep. at 116; Owen Dep. Ex. 9.

Response:  Admitted and that such manual was provided to Georgia-Pacific for its use with its employees.

27.    The instruction manual contained a disclaimer which provided that "The information contained in this manual deals with general suggestions for handling employment related problems; however, it does not consist of legal advice or services. As particular problems develop, employers and their representatives should contact counsel for advice as indicated throughout the Civil Treatments For Managers Program." Owen Dep. Ex. 9 at unnumbered title page.

Response:  Denied.   Such language does not constitute a disclaimer under Connecticut law.  It does not state that such document does not constitute a contract.

28.    The authors provided places throughout the manual for students to complete exercises, make notes, and write down their reflections on the presentations. See, ~ Owen Dep. Ex. 9 at 23, 33, 39.

Response:  Admitted.

29.   The manual contained "guidelines" for managers. See Owen Dep. at 12325, 128.

Response:   Admitted but note that plaintiff specifically described the manual in her Court Complaint as being a contract, not a guideline. Complaint, paras. 23 to 31.

30.   Georgia-Pacific has developed a computer-based "intranet 'where employees can access information regarding the Company's many policies, procedures and programs. Owen Dep. at 135-37; Richman Decl. at T 6.

Response:   Admitted but submit that such "intranet" procedure does not effectively communicate a contract disclaimer to employees since an employee goes directly to a specific policy on the "intranet" as compared to starting at the beginning of a hard copy personnel manual where the contract disclaimer is normally located.

31.   There was no Georgia-Pacific employee handbook, or personnel manual applicable to employees at the Norwalk facility; rather, Georgia-Pacific communicated its policies to employees through the intranet system. Owen Dep. at 136-37; Richman Decl. at T6.

Response:   Admitted

32. Among the programs which employees could access on the intranet is the Georgia-Pacific Total Performance Management web-based tool ("TPM"). Owen Dep. at 136; Owen Dep. Ex. 10; Richman Decl. at T 7.

Response:  Admitted.

33.   The TPM tool was located in a section titled "My HR" (Human

Resources). Richman Decl. at T 7.

Response:  Admitted but it was unknown to the plaintiff during her employment. Owen dep. 215.

34.   Also located in the "My HR" section of the intranet was Georgia-Pacific's policy regarding termination of employment. Owen Dep. at 215-16; Owen Dep. Ex. 11; Richman Decl. at T 8.

Response:  Admitted but never seen by plaintiff.  Owen dep. 215.

35.   The Georgia-Pacific policy regarding termination of employment stated, "It is the policy of Georgia-Pacific Corporation that the employment of any salaried employee or non-bargaining unit hourly employee can be terminated, with or without cause, at any time, at the option of the employee or at the option of the Company. No employee or representative of Georgia-Pacific Corporation or any of its subsidiaries, other than the chairman of the board of Georgia-Pacific Corporation or his appointed designee has any authority to enter into any agreement guaranteeing or extending the employment of any employee for any specific period of time, or to make any agreement contrary to the foregoing." Owen Dep. Ex. 11.

Response:  Admitted but not seen by plaintiff during her employment with defendant.  Owen dep. 215.  Such "intranet" procedure does not effectively communicate a contract disclaimer to employees.

36.   The termination of employment policy was available on the intranet at the time of Ms. Owen's termination from employment. Richman Decl. at 1 8.

Response:  Admitted but not seen by plaintiff during her employment with

defendant.   Owen dep. 215.

37.   Ms. Owen had access to Georgia-Pacific's human resource policies through the intranet. Owen. Dep. at 136-37; 215-16.

Response:  Admitted but such "intranet" procedure does not effectively communicate a contract disclaimer to employees.

38.   TPM was a web-based tool managers used to evaluate employee performance. Owen Dep. at 136; Richman Decl. at 1 7.

Response:  Admitted but such TPM tool was used for other purposes as well.

39. Supervisors could use the TPM tool "on-line" to enter data regarding an employee's performance, and to prepare an employee's performance evaluation. Owen Dep. at 136; Richman Decl. at 1 7.

Response:  Denied.  Supervisors were instructed to change over to TPM "Tool" to complete evaluations by December 31, 2001.  Owen affidavit at 4.

40.   The TPM tool "was being implemented for the first year starting with 2002." Owen Dep. at 137; see also Richman Decl. At 1 7.

Response:  Denied.  Supervisors were instructed to use the new tool in preparation for the 2002 plan year that began in the Fall of 2001.  Owen affidavit at  4.

41.   Plaintiff's supervisor, Mr. Wayne Grant, was instructed that year-end annual evaluations for calendar year 2002 were to be completed by using the TPM tool.  Deposition of Wayne Grant attached as Exhibit D ("Grant Dep.") at 61; Richman Decl. at 17.

Response:  Admitted.

42.    On March 15, 2002, Plaintiff printed an overview of the TPM program from the Georgia-Pacific intranet. Owen Dep. at 135-36; Owen Dep. Ex. 10.

Response:  Admitted.

43.    To provide certain benefits to eligible employees affected by the combination of Georgia-Pacific and Fort James, Georgia-Pacific established the Georgia-Pacific Corporation - Fort James Transition Severance Pay Plan For Salaried Employees (the "Transition Severance Pay Plan"). Owen Dep. Ex 4 at p. 1.

Response:  Admitted.

44.    The Transition Severance Pay Plan was later amended and restated effective December 31, 2001, and Ms. Owen received a copy of the Transition Severance Pay Plan during her employment. Owen Dep. at 27; Owen Dep. Ex. 4.

Response:  Admitted.

45.    The Transition Severance Pay Plan expressly provides that Georgia-Pacific intended that the Plan "constitute a 'welfare plan' under [the Employee Retirement Income Security Act of 1974, as amended ("ERISA")]." Owen Dep. Ex. 4 at 16 (Q&A 15).

Response:  Admitted.

46.    The Transition Severance Pay Plan provides that an "Eligible Employee" whose employment is severed involuntarily will be entitled to severance benefits under the Plan if "[t]he Eligible Employee remains an Eligible Employee through his/her Termination Date." Owen Dep. Ex. 4 at p. 2-3 (Q&A

3).

Response:  Admitted.

47. The term "Termination Date" is defined as the date specified by the Employer as of which an Eligible Employee's employment "will be deemed to have terminated for purposes of this Plan." Owen Dep. Ex. 4 at p. 6 (Q&A 4).

Response:  Admitted.

48.     The Transition Severance Pay Plan further provides that "Voluntary termination or termination for Cause before the Termination Date will result in the forfeiture of any right to severance benefits under this Plan," and defines "Cause" to include "poor performance." Owen Dep. Ex. 4 at p. 6 (Q&A 4); Owen Dep. Ex. 4 at p. 3 (Q&A 3).

Response:  Admitted.

49.     The severance benefits provided under the Plan are calculated in accordance with formulas described on pages 7-14 of the Plan. Owen Dep. Ex. 4 at p. 714.

Response:  Admitted.

50.     Had Ms. Owen been eligible for benefits under the Plan, her base severance benefits would have been calculated according to the Fort James chart on page 9 of the Plan, and would have amounted to 24 weeks of severance pay. Owen Dep. 29; Owen Dep. Ex. 4 at 9.

Response:  Admitted.

51.     The Plan provided for supplemental severance benefits which, if applicable to Ms. Owen, would have amounted to 17 weeks according to the

formula on page 9 of the Plan. Owen Dep. at 30; Owen Dep. Ex. 4 at 9.

Response:  Admitted.

52. In early March 2002, Georgia-Pacific announced its decision to relocate the Dixie headquarters from Norwalk, Connecticut to Atlanta, Georgia. Owen Dep. at 21-22.

Response:  Admitted.

53.    A meeting was held with employees in Norwalk to inform them of the decision to relocate the business to Atlanta, as well as the Transition Severance Pay Plan. Owen Dep. at 21-23; 26-27.

Response:  Admitted.


54.    There were at least 30 people present at the meeting concerning the relocation to Atlanta. Owen Dep. at 22-23.

Response:  Admitted.

55.    At the meeting to discuss relocation, Mr. William Schultz, the President of the Dixie business, informed the employees that "you have the same job, it's just in Atlanta." Owen Dep. at 22.

Response:  Admitted.

56.    Employees were encouraged to make an exploratory trip to Atlanta to evaluate housing opportunities, schools, and other living conditions. Owen Dep. at 25.

Response:  Admitted.

57.    Sometime after the meeting to discuss relocation, Plaintiff had a

conversation with Mike Dunn, the Georgia-Pacific Vice-President and General Manager for the Dixie Foodservice business, who stated that even if Plaintiff wasn't offered relocation to Atlanta it would be a "win-win" situation. Owen Dep. at 31.

Response:  Admitted.

58.   Plaintiff understood Mr. Dunn's comment to be a reference to severance benefits pursuant to the Transition Severance Pay Plan. Owen Dep. at 37, 39.

Response:  Denied as not so stated on pages 37 or 39 of plaintiff's deposition.

59.   Plaintiff understood that if she wasn't offered an opportunity to relocate to Atlanta, she would be able to continue her employment until the end of the year. Owen Dep. at 25-26.

Response:  Admitted.

60.   Plaintiff's understanding was based on the provisions regarding employees' "Termination Date" contained in the Transition Severance Pay Plan, and  discussions describing Norwalk employees' "Termination Date" as December 31, 2002. Owen Dep. at 34-35.

Response:  Admitted.

61.   Plaintiff further understood that if she was not offered employment in Atlanta and was therefore terminated, she would have received the severance benefits provided by the Transition Severance Pay Plan. Owen Dep. at 26, 31-32.

Response:  Admitted.

62.   Following the commencement of her employment, Mr. Grant noted that

Ms. Owen displayed a communication style that was sometimes aggressive. Grant Decl. at T 5.

Response:  Admitted but defendant appraised plaintiff's "assertiveness" as being a "strength". Defendant's brief, Owen dep. exhs. 15 and 20.

63. Mr. Grant felt that Ms. Owen's aggressive communication style put some important relationships in question, particularly those with product supply lead roles and sales managers. Grant Decl. at T 5.

Response:  Admitted but defendant encouraged its employees to be "assertive" and Mr. Grant acknowledged the "tension" problem which existed between the sales employees who wanted volume in sales and the marketing employees who wanted profitability in sales. Grant dep. 54-55.   Grant considered her assertiveness to be a strength. Grant dep. 64.  Grant agreed that conflicts result due to such tension. Grant dep. 55.

64.    On July 28, 2000, Mr. Grant prepared a mid-year evaluation of Ms. Owen's performance, which specifically highlighted her aggressive style as an area on which she should focus and improve. Grant Decl. at T 5; Owen Dep. Ex. 15.

Response:  Admitted but defendant encouraged its employees to be "assertive" and Mr. Grant acknowledged the "tension" problem which existed between the sales employees who wanted volume in sales and the marketing employees who wanted profitability in sales. Grant dep.54-55.

65.    In Mr. Grant's opinion, Ms. Owen did not improve her communication skills after her July 28, 2000 evaluation. Grant Decl. at T 6.

**Response:  Denied.   Grant testified that Ms. Owen's job performance had improved. Defendant's brief; Owen dep, exh. 22.**

66.    On July 31, 2000, just three days following her mid-year evaluation, Mr. Grant received an email from Mr. Tom Hasley, a division sales manager. Grant Decl. at 1 6; Owen Dep. Ex. 17. Mr. Hasley forwarded to Mr. Grant an email he had received from Ms. Owen. In this email, Ms. Owen stated, "Your e-mails are wasting our time, do not bother replying." Grant Decl. at T 6; Owen Dep. Ex. 17.

**Response:  Denied because plaintiff doesn't recall such email  Owen dep. 248-249.  Furthermore, defendant encouraged its employees to be "assertive" and Mr. Grant acknowledged the "tension" problem which existed between the sales employees who wanted volume in sales and the marketing employees who wanted profitability in sales. Grant dep. 54-56.**

67.    On July 31, 2000, Ms. Owen responded via email to a request from Mr. Fred Gerger, a division sales manager, by stating, "I am not going to answer your question. Ask your customer service representative. I don't need requests that waste both your time and mine." Grant Decl. at T 6; Owen Dep. Ex. 16.

**Response:   Admitted but Ms. Owen testified that she had received very abusive emails from Mr. Gerger which prompted such response. Owen dep. 242.**

68.    On October 12, 2000, Mr. Grant received an email from Robert Clark, Director of Manufacturing and Operations, where Mr. Clark raised a concern

regarding Ms. Owen's communication style. Grant Decl. at T 7; Owen Dep. Ex. 18.

Response:  Admitted but defendant encouraged its employees to be "assertive" and Mr. Grant acknowledged the "tension" problem which existed between the sales employees who wanted volume in sales and the marketing employees who wanted profitability in sales. Grant dep. 54-56.

69.     Mr. Grant prepared Donna Owen's year-end review for calendar year 2000 on or about December 31, 2000. Grant Decl. at T 8; Owen Dep. Ex. 20.

Response:  Admitted.

70.     In his year-end 2000 review of Ms. Owen, Mr. Grant documented Ms. Owen's need to improve the quality and completeness of her work and her qualitative and analytical skills, as well as her continuing need to improve her communication and interpersonal skills. Grant Decl. at T 8; Owen Dep. Ex. 20. In her overall assessment, Mr. Grant noted that Ms. Owen's performance in 2001 would largely be determined by her "leadership and management of Plastics." Grant Decl. at T 8; Owen Dep. Ex. 20.

Response:  Admitted but  such year-end 2000 review also noted that plaintiff "took on a challenging assignment" of trying to "relaunch our clear cup line for the third time in as many years".  It also stated that one of plaintiff's strengths is that she is "assertive", "takes a leadership role", and is working to improve profitability. Defendant's brief, Owen dep, exh. 20.

71.     Mr. Grant determined that Ms. Owen did not improve her performance in 2001. Grant Decl. at T 9.

Response:  Denied.   Grant testified that Ms. Owen's job performance had improved. Defendant's brief; Owen dep, exh. 22.

72.    In May 2001 Mr. Grant received another email from Mr. Gerger complaining about Ms. Owen's treatment of a member of his sales organization. Grant Decl. at T 9; Owen Dep. Ex. 20.

Response:  Admitted but Ms. Owen testified that she had received very abusive emails from Mr. Gerger which prompted such response.  Owen dep. 242.

73.    Mr. Grant received numerous emails from Chuck Hathaway, Georgia-Pacific's Vice-President of Sales, regarding Ms. Owen's poor performance. Grant Decl. at I 10, see, e.g., Grant Decl. Ex. A, B, C, and E.

Response:  Admitted but defendant encouraged its employees to be "assertive" and Mr. Grant acknowledged the "tension" problem which existed between the sales employees who wanted volume in sales and the marketing employees who wanted profitability in sales.  Grant dep. 54-55.   Grant considered her assertiveness to be a strength. Grant dep. 64.  Grant agreed that conflicts result due to such tension. Grant dep. 55.  He also agreed that the sales force is aggravated at times due to such conflict over the pricing. Grant dep. 56-57.

74.    In an email, Mr. Hathaway reported to Mr. Grant that Ms. Owen was "alienating herself from sales." Grant Decl. at T 10; Grant Decl. Ex. B. Ms. Owen had responded to a sales inquiry by stating that "[t]his business is not worth the time & effort that has already been expended ... I find no compelling

reason to approve this level of pricing." Grant Decl. at I 10; Grant Decl. Ex. B.

Response:  Admitted but defendant encouraged its employees to be "assertive" and Mr. Grant acknowledged the "tension" problem which existed between the sales employees who wanted volume in sales and the marketing employees who wanted profitability in sales.  Grant dep. 54-55.  Grant considered her assertiveness to be a strength. Grant dep. 64.  Grant agreed that conflicts result due to such tension. Grant dep. 55.  He also agreed that the sales force is aggravated at times due to such conflict over the pricing. Grant dep. 56-57.

75.    In an email to Mr. Grant, Mr. Hathaway forwarded a communication from a "frustrated" division sales manager. Grant Decl. at I 11; Grant Decl. Ex. C. The manager, Sandi Matthews, described Ms. Owen as follows: "This woman is nuts and a detriment to our business. She is extremely short sighted and it really bothers me that she is in charge of a product category that is replacing paper and is the biggest opportunity for our business in years. She doesn't understand our business, our customers or our sales people." Grant Decl. Ex. C.

Response:  Admitted but defendant encouraged its employees to be "assertive" and Mr. Grant acknowledged the "tension" problem which existed between the sales employees who wanted volume in sales and the marketing employees who wanted profitability in sales.  Grant dep. 54-55.  Grant considered her assertiveness to be a strength. Grant dep. 64.  Grant agreed that conflicts result due to such tension. Grant dep. 55.  He also agreed that

the sales force is aggravated at times due to such conflict over the pricing. Grant dep. 56-57.

76.    On January 31, 2002, Mr. Grant received an email from Sandi Matthews. Grant Decl. at T 12; Grant Decl. Ex. D. In this email Ms. Matthews, complaining about Ms. Owen's performance, stated, "Has this woman lost her mind????????? Why does Donna continuously cause problems and berate people for trying to do their job in a timely manner. She obviously has no sense of who her customer is nor does it appear she really cares. Her attitude belittles people and quite frankly she is a risk to this business." Grant Decl. Ex. D.

Response:   Admitted but defendant encouraged its employees to be "assertive" and Mr. Grant acknowledged the "tension" problem which existed between the sales employees who wanted volume in sales and the marketing employees who wanted profitability in sales.  Grant dep. 54-55.  Grant considered her assertiveness to be a strength. Grant dep. 64.  Grant agreed that conflicts result due to such tension. Grant dep. 55.  He also agreed that the sales force is aggravated at times due to such conflict over the pricing. Grant dep. 56-57.

77.    On February 26, 2002, Mr. Grant received an email from Mr. Hathaway containing a complaint about Ms. Owen's poor performance. Grant Decl. at T 13; Grant Decl. Ex. E. In this email, Chris Whiting, a division sales manager, complained, "I have bit my tongue way too long. She is poison and has to go! No market knowledge, poor communication skills, no desire to learn, no

interest in building relationships with sales or customers. Internally, we have lost credibility for keeping her this long." Grant Deci. Ex. E.

Response: Admitted but defendant encouraged its employees to be "assertive" and Mr. Grant acknowledged the "tension" problem which existed between the sales employees who wanted volume in sales and the marketing employees who wanted profitability in sales. Grant dep. 54-55. Grant considered her assertiveness to be a strength. Grant dep. 64. Grant agreed that conflicts result due to such tension. Grant dep. 55. He also agreed that the sales force is aggravated at times due to such conflict over the pricing. Grant dep. 56-57.

78.    On or about March 1, 2002, Mr. Grant prepared Ms. Owen's performance review for 2001. Grant Decl. at T 14; Owen Dep. Ex. 22.

Response: Denied. Mr. Grant testified that he prepared Ms. Owen's job performance review after he recommended to Mr. Dunn that she be fired. Mr. Grant testified that he met with Mr. Dunn about a week after he became his new manager. Mr. Dunn didn't become his new manager until March 1, 2002. Accordingly, Mr. Grant prepared Ms. Owen's job performance review after he met with Mr. Dunn. Grant dep. 17.

79.    In his March 2002 review of Ms. Owen, Mr. Grant noted three critical areas in which Ms. Owen exhibited poor performance: her analytic skills, leadership and people management. Grant Decl. at T 14; Owen Dep. Ex. 22.

Response:  Admitted but such review was written after the recommendation to terminate Ms. Owen had already been made to Mr. Dunn and was an attempt to

justify her termination.  Furthermore, such review was inexplicably a very different evaluation form from her two prior evaluations since there were no references to Accomplishments or to Strengths.  Defendant's brief, Owen dep exhs. 15, 20 and 22.  Such review "rounded down" his 2.6 evaluation of the plaintiff to a 2.0 rating although his two earlier evaluations of the plaintiff at 2.9 were not rounded up to 3.0.  Defendant's brief, Owen dep. Exh. 10, page 11.

80.     Mr. Grant had counseled Ms. Owen during her prior reviews that analytic skills, leadership, and people management were areas critical to her success as a Product Manager. Grant Decl. at T 14; Owen Dep. Ex. 22.

Response:  Admitted but Mr. Grant rarely met with Ms. Owen and did not follow the progressive discipline required by the Civil Treatments document.

81.    In early March 2002, Mike Dunn was named Georgia-Pacific's Vice-President and General Manager for the Dixie Foodservice business. See Declaration of Mike Dunn attached as Exhibit E ("Dunn Decl.") at T 3.

Response:  Admitted.

82. After his appointment as Georgia-Pacific's Vice-President and General Manager for the Dixie Foodservice business, Mr. Dunn began having meetings with the Dixie Foodservice managers who reported to him. Dunn Decl. at T 3.

Response:  Admitted.

83.     During meetings with the Dixie Foodservice Managers who reported to him, Mr. Dunn would ask managers for a review of their areas' strengths and weaknesses and an assessment of the personnel in their area. Dunn Decl. at 1 3.

Response: Admitted.

84.     During a meeting with Mr. Dunn, Mr. Grant identified Donna Owen as a

poor performer in his group. Dunn Decl. at T 4; Grant Dep. at 11-13.

Response: Admitted but contend that such identification was done on a

retaliatory basis as alleged in plaintiff's Complaint since plaintiff's performance

had been above average.  Complaint para. 7 to 11.  Grant agreed that his

evaluations are somewhat subjective. Grant dep. 65.  Grant also agreed that

he was not familiar with the termination of employment policy and that it was

not considered in his recommendation to terminate the plaintiff.  Grant dep.

63.  Grant also testified that he did not follow the TPM procedures regarding

the plaintiff.  Grant dep. 59.  Nor did he follow the Civil Treatment procedures

in recommending the plaintiff's termination.  Grant dep. 73.

85.     Mr. Grant suggested that Mr. Dunn seek further input regarding Ms.

Owen's performance from managers in the sales department. Dunn Decl. at 1

4; Grant Dep. at 15.

Response: Admitted.

86.     Mr. Dunn asked Mr. Grant for his recommendation regarding Ms. Owen's

employment situation, and Mr. Grant recommended that Ms. Owen's

employment be terminated. Dunn Decl. at T 4; Grant Dep. at 22.

Response: Admitted but it is contended that such recommendation was in

retaliation against Ms. Owen for her having complained about his supervision

of her on several occasions to the Human Resources Department.

87.     In meetings with other managers, including managers from the sales

and finance departments, Mr. Dunn was consistently informed that Ms. Owen's poor performance was detrimental to the Dixie Foodservice organization. Dunn Decl. at T 5. These comments were generally unsolicited. Dunn Decl. at T 5.

**Response:** Disputed since plaintiff has no knowledge as to what Mr. Dunn was told or was not told by other managers. Plaintiff does contend that the "tension" problem which existed between the sales employees who wanted volume in sales and the marketing employees who wanted profitability in sales resulted in complaints.

88.    The feedback Mr. Dunn received included comments regarding Ms. Owen's inability to do her job, her abrasive style, her lack of communication skills, and her negative impact on key team members' ability to do their jobs. Dunn Decl. at T 5.

**Response:**    Plaintiff has no knowledge as to what Mr. Dunn was told or was not told by other managers. Plaintiff does contend that the "tension" problem which existed between the sales employees who wanted volume in sales and the marketing employees who wanted profitability in sales resulted in complaints. Defendant encouraged its employees to be "assertive" and Mr. Grant acknowledged the "tension" problem which existed between the sales employees who wanted volume in sales and the marketing employees who wanted profitability in sales. Grant dep. 54-55. Grant considered her assertiveness to be a strength. Grant dep. 64. Grant agreed that conflicts result due to such tension. Grant dep. 55. He also agreed that the sales force

is aggravated at times due to such conflict over the pricing.   Grant dep. 56-57.

**89.** In light of the consistent feedback Mr. Dunn received regarding Ms. Owen's performance, Mr. Dunn decided to terminate Ms. Owen's employment for poor performance. Dunn Decl. at 1 6.

**Response:**        Plaintiff has no knowledge as to what Mr. Dunn decided or not as to what the basis of his decision was.  Plaintiff does contend that the "tension" problem which existed between the sales employees who wanted volume in sales and the marketing employees who wanted profitability in sales resulted in complaints.  Defendant encouraged its employees to be "assertive" and Mr. Grant acknowledged the "tension" problem which existed between the sales employees who wanted volume in sales and the marketing employees who wanted profitability in sales.  Grant dep. 54-55.  Grant considered her assertiveness to be a strength. Grant dep. 64.  Grant agreed that conflicts result due to such tension. Grant dep. 55.  He also agreed that  the sales force is aggravated at times due to such conflict over the pricing.  Grant dep. 56-57.

**90.**    Ms. Owen was terminated on or about April 15, 2002. Owen Dep. at 276.

**Response:  Admitted.**


### MATERIAL QUESTIONS OF FACT

1.    Does the TPM document constitute an implied employment contract?

2.    Does the Civil Treatment for Managers resource manual document constitute an implied employment contract?

3.    Was there a breach of the claimed implied employment contracts

because of the lack of the required progressive discipline being applied to the plaintiff prior to her discharge?

4.    Was there a breach of the claimed implied employment contracts because the alleged "poor performance" reason for discharge on April 15, 2002 is inconsistent with plaintiff having recently received a $21,000 performance bonus just two months prior to her discharge and her 2002 job performance to date was substantially above average?

5.    Was defendant's Wayne Grant negligent by "rounding down" plaintiff's 2.6 job performance appraisal for 2001 since defendant did not "round up" plaintiff's 2.9 job performance appraisal for 2000 or her mid-2000 job performance appraisal rating of 2.9?

6.    Did defendant's Wayne Grant retaliate against plaintiff for her having complained to Human Resources about him?

7.    Was defendant's Wayne Grant negligent in ignoring plaintiff's requests for input and assistance from him?

8.    Was the TPM method to be used during 2002 or only for evaluations at the end of 2002?

9.    Did defendant's Wayne Grant retaliate against plaintiff (for her having complained to Human Resources about him) by using the complaints about her from the sales department employees to justify her termination rather than supporting her by telling the sales department employees that "profits" were more important than "volume"?

10.    A genuine issue of material fact exists regarding the existence and

terms of an implied contract.

11.    Whether defendant's characterization of the alleged contract's terms is correct is a material question of fact.

12.    Whether or not the plaintiff has established his claim of promissory estoppel  is a material question of fact.

13.    Whether defendant's use of the Intranet to inform its employees of the contract disclaimer was a reasonable and effective way to communicate such message to its employees?

14.    Whether or not defendant owed a duty to plaintiff to follow its TPM and/or Civil Treatment for Managers resource manual.

15.    Whether or not defendant breached its duty to plaintiff to follow its TPM and/or Civil Treatment for Managers resource manual.

16.    Did the defendant follow its progressive discipline policy before firing the plaintiff?

17.    Was the defendant negligent in not taking any steps to address plaintiff's complaints about her manager, Wayne Grant?

18.    Was the defendant negligent when its agent, Wayne Grant, recommended the discharge of the plaintiff on three separate occasions without knowing about the defendant's termination of employment policy or using same?

19.    Was the retaliatory discharge of plaintiff a violation of the implied covenant of good faith and fair dealing?

                                        THE PLAINTIFF:
                                        DONNA OWEN

By:_____
Stephen P. Horner, Esquire
2183 Boston Post Road
Darien, Connecticut 06820
Federal Bar Number: ct 02460
(203) 655-7905

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the forgoing was sent via first class mail, postage prepaid on February 23, 2004 to:

Richard D. Haygood, Esq.
Kilpatrick Stockton LLP
3737 Glenwood Avenue, Suite 400
Raleigh, North Carolina 27512

_____

**Stephen P. Horner**