

PLAINTIFF'S
EXHIBIT

B

ALL-STATE® INTERNATIONAL

December 4, 2003

Wayne Grant

Page 1

```
 1              UNITED STATES DISTRICT COURT
                  DISTRICT OF CONNECTICUT
 2

      CASE No. 3:03 CV 378 (DJS)
 3    - - - - - - - - - - - - - - - -X
 4    DONNA OWEN,
 5                      Plaintiff,
 6             vs.
 7    GEORGIA-PACIFIC,
 8                      Defendant.
      - - - - - - - - - - - - - - - -X
 9
10
11

12              D E P O S I T I O N
13         The deposition of WAYNE A. GRANT was taken pursuant
14    to Notice at the Law Offices of Stephen P. Horner, 2183
15    Boston Post Road, Darien, Connecticut, before Viktoria V.
16    Stockmal, License #00251, a Notary Public in and for the
17    State of Connecticut, on Wednesday, December 4, 2003, at
18    9:30 a.m.
19
20
21
22
23
24
25
```

OWEN v GEORGIA-PACIFIC

December 4, 2003                                                                                          Wayne Grant

Page 14

1     A     I don't recall.
2     Q     Was it during 2002?
3     A     Yes, it was during 2002.
4     Q     Do you recall approximately how long
5  Mr. Dunn had been your new manager before he asked you
6  for your assessment of your staff?
7     A     Within the first week of him being appointed
8  to that position.
9     Q     Which employee did you rate as exceptional?
10    A     Liz Stewart.
11    Q     When you advised Mr. Dunn that your
12 assessment of Donna Owen was poor, did you provide any
13 further information at that time regarding Ms. Owen?
14    A     For each of the assessments, I provided a
15 thumbnail or one or two sentence top line of what each of
16 those ratings meant.
17    Q     And what did you say about Ms. Owen in that
18 thumbnail sketch to Mr. Dunn?
19    A     I recall saying two specific things. First,
20 her analytics and quality of work were inconsistent and
21 generally poor, but most importantly it was my assessment
22 she had alienated the sales organization.
23    Q     Anything else?
24    A     That's what I recall.
25    Q     Did Mr. Dunn ask you any questions during

Page 15

1  this meeting about Mr. Dunn -- about Ms. Owen?
2     A     I think he asked me to expand on both those
3  points.
4     Q     And did you?
5     A     I don't recall precisely. I probably did on
6  the first point. On the second point, what I do recall
7  telling him was, which is alienating the sales
8  organization, is that I would let him draw his own
9  conclusion on that. He needed to talk with various
10 people in the sales organization.
11    Q     What did you expand on with regard to number
12 one, the analytics and the quality?
13    A     I don't recall.
14    Q     Is it your assumption that Mr. Dunn is the
15 one who made the decision to terminate Ms. Owen?
16           MR. HAYGOOD: Objection. Calls for
17 speculation.
18 BY THE WITNESS:
19    A     I don't know.
20    Q     Who would normally make such a decision at
21 Georgia-Pacific?
22    A     Who would normally?
23    Q     Yes.
24    A     I don't know.
25    Q     What role does one's manager normally play

Page 16

1  in the termination of one's employment at
2  Georgia-Pacific?
3     A     I don't know.
4     Q     Are you familiar with the company's
5  termination policy?
6     A     With Georgia-Pacific's termination policy?
7     Q     Correct.
8     A     I am not familiar with it.
9     Q     Do you recall if your discussion with
10 Mr. Dunn was before or after you did the performance
11 evaluation on Ms. Owen?
12    A     Prior to my discussion with Mr. Dunn, I had
13 documented two performance reviews on Ms. Owen.
14    Q     Which years were those?
15    A     There was a review done in mid year 2000.
16 There was a review done in early 2001 for full year 2000.
17 Those are the two reviews.
18    Q     With regards to the evaluation that you did
19 on Ms. Owen in March of 2002, was that evaluation done
20 before or after your conversation with Mr. Dunn that you
21 were just describing?
22    A     I don't believe my final draft was done.
23 The final document was done.
24    Q     Are you testifying that you had done an
25 initial draft of her evaluation before you had your

Page 17

1  conversation with Mr. Dunn?
2     A     No, I'm not. All I'm saying is I didn't
3  have my final version done at that point.
4     Q     Do you recall how much time passed after
5  your conversation with Mr. Dunn that you finalized your
6  evaluation of Ms. Owen for 2001?
7     A     For 2001, no, I don't. I don't recall.
8     Q     Any idea? A week? Two weeks? A month?
9     A     Within one to two months.
10    Q     Within one to two months after your
11 conversation with Mr. Dunn is when you completed the
12 evaluation; do I understand that correctly?
13    A     To my best recollection, yes.
14    Q     Did you discuss with Mr. Dunn at all the
15 difficulties that Ms. Owen had with her portfolio?
16           MR. HAYGOOD: Object to form.
17 BY THE WITNESS:
18    A     Yes.
19    Q     What did you say about that?
20    A     I don't recall exactly, but I gave him a top
21 line for each of the product lines that I had
22 responsibility for and highlighted key projects and key
23 issues. And that's how any difficulties, as you say, in
24 that portfolio would have been highlighted.
25    Q     Did you suggest that Mr. Dunn talk with any

5 (Pages 14 to 17)

December 4, 2003                                                                                    Wayne Grant



Page 22

1    Q    Did he say anything else?
2    A    No.
3    Q    Was there any discussion of terminating
4    Ms. Owen at that meeting?
5    A    I reiterated my recommendation to terminate.
6    Q    What were your exact words?
7    A    I don't recall.
8    Q    Do you recall anything about what -- about
9    your recommendation?
10   A    I recall that I recommended once again that
11   we should terminate her.
12   Q    Had you ever recommended to anyone in
13   management prior to Mr. Dunn becoming your new boss that
14   Ms. Owen be terminated?
15   A    Yes, I did.
16   Q    Who was that to?
17   A    It was to my prior boss.
18   Q    Who was that?
19   A    Clyde Noel.
20   Q    What did you say to Mr. Noel?
21   A    I recommended that we terminate Ms. Owen for
22   poor performance.
23   Q    When was that?
24   A    Some time early in the year 2001.  A year
25   prior.

Page 24

1    he felt that we needed to see how that played out, see if
2    Ms. Owen could show improvement in those areas to focus
3    on.  So it was really, you know, his bias was for some
4    more time.
5    Q    Had you recommended to anyone else at
6    Georgia-Pacific that Donna Owen be discharged other than
7    what you've already testified about?
8    A    I did not recommend that she specifically be
9    terminated to anyone else.
10   Q    Did you have any discussions with anyone
11   else in management regarding Ms. Owen's job performance?
12   A    Yes.
13   Q    How many such discussions?
14   A    One.
15   Q    Who was that with?
16   A    It was with -- I'm not sure of all the
17   people that were in the room.  I do know that Bill
18   Schultz who was the president of Dixie and Kathy DeCesare
19   who was at that time the vice-president of human
20   resources were in the room.
21   Q    And there may have been others?
22   A    I think there was one or two others.
23   Q    When did this meeting take place?
24   A    I don't know the precise date.  It was some
25   time in the middle of 2001 like May, June, July,

Page 23

1    Q    Did you give him any specifics as to why you
2    were making this recommendation on poor performance?
3    A    I referenced the two reviews that I had done
4    which outlined specifically poor performance.
5    Q    Do you recall what Mr. Noel's response was
6    to your recommendation?
7    A    When I specifically made the recommendation,
8    he said he wanted to think about it for a while.  And in
9    some form we got back together.  I don't remember if we
10   got back together formally or in the hallway or how we
11   got back together some time after that.  And his response
12   at that time was he wanted to -- he wasn't where I was at
13   at that point.
14   Q    Would I be correct in assuming that he
15   rejected your recommendation to terminate her?
16       MR. HAYGOOD:  Object to form.
17   BY THE WITNESS:
18   A    No, I don't think that's correct to assume
19   that.
20   Q    Okay.  Did he say why he wasn't where you
21   were with regards to your recommendation at that time?
22   A    He felt that she should have some more time
23   to prove one way or the other.  And he felt that my
24   review which was for the year -- full year 2000, you
25   know, outlined some areas that she needed to focus on and

Page 25

1    somewhere in that area.
2    Q    Was it after your conversation with
3    Mr. Noel?
4    A    Yes.
5    Q    What was the purpose for this meeting?
6    A    This was a succession planning meeting.
7    Q    What did you say at that meeting regarding
8    Donna Owen?
9    A    I indicated that her performance was poor,
10   that I had previously on two occasions documented the
11   issues in the two reviews that I've referenced before,
12   that I was not seeing any improvement in those areas to
13   focus on and that we were -- that I felt we were coming
14   to a point where if we don't see improvement soon, that
15   we need to terminate Ms. Owen.
16   Q    What response did you receive from anyone at
17   that meeting with regard to those statements?
18   A    I don't remember any specific response, but
19   there was support for everything that I presented at that
20   meeting.
21   Q    Do you recall how they indicated support?
22   A    Some kind of verbal indication.
23   Q    Okay.
24   A    That's all I recall.
25   Q    Did you give anything in writing to Mr. Noel

SANDERS, GALE & RUSSELL
(203) 624-4157

December 4, 2003

OWEN v GEORGIA-PACIFIC

Wayne Grant

Page 38

1    A    Do you want me to review her job
2  description?
3    Q    Well you said part of her mission was to
4  increase income from operations.  Was that the main focus
5  that she was aiming for or was there some other main
6  focus?
7    A    The main focus was to be the leader of the
8  plastics business portfolio for the Dixie Foodservice
9  business.
10    Q    And how important was it to increase IFO?
11    A    IFO was one of the key measures.
12    Q    Measures of what?
13    A    Of what each of us in the business, sales,
14  marketing, were responsible for.
15    Q    How did Ms. Owen do while working for you on
16  increasing IFO?
17    A    She did not do well.
18    Q    Do you have any more specifics on that?
19    A    No.
20    Q    Do you recall how her performance was for
21  the first quarter of 2002 as compared to the first
22  quarter of 2001?
23    A    With regards to what?
24    Q    IFO?
25    A    No.

Page 39

1    Q    Do you recall if it was increased over a
2  year earlier?
3    A    No, I don't.
4    Q    How important was IFO in deciding how much
5  of a bonus a product manager would receive?
6    A    In which year?
7    Q    For 2001.
8    A    Not at all.
9    Q    What was the basis for the bonus awarded for
10  2001?
11    A    The bonus in 2001, it was essentially
12  guaranteed due to the acquisition of our company by
13  Georgia-Pacific.
14    Q    Is there any document that says that it was
15  guaranteed?
16    A    I recall there being a document.  I vaguely
17  in my mind...
18    Q    That said what?
19    A    Something to that effect.
20        MR. HORNER:  Has that been produced,
21  Richard?
22        MR. HAYGOOD:  I don't know.
23        THE WITNESS:  It's nothing that I
24  have.  It's just something that I vaguely remember
25  seeing.

Page 40

1        MR. HAYGOOD:  I'll be happy to look
2  into it.
3        MR. HORNER:  Thank you.
4  BY MR. HORNER:
5    Q    Are you testifying that even poor performers
6  would get a bonus in 2001?
7    A    That's correct.
8        Yes, I am.
9    Q    What determined the amount of the bonus that
10  one would receive for 2001?
11    A    I don't recall.
12    Q    Now with regard to the bonus that was
13  guaranteed, are you referring to the year 2000 that was
14  paid in early 2001 or are you referring to the year 2001
15  that was paid in early 2002?
16    A    I don't remember.
17    Q    Who made the decision as to how much bonus
18  money was paid for the bonus that was paid in February of
19  2002 for 2001?
20        MR. HAYGOOD:  Object to form.  You
21  can answer.
22  BY THE WITNESS:
23    A    I don't know.
24    Q    What role, if any, did you play in the
25  decision to award bonuses and the amount of bonuses to be

Page 41

1  paid in February 2002 for the year 2001?
2        MR. HAYGOOD:  Object to form.  You
3  can answer.
4  BY THE WITNESS:
5    A    I assigned a numeric rating to each of my
6  employees.
7    Q    Okay.  And what was the range of that
8  numeric rating?
9    A    I don't recall.
10    Q    Do you recall what rating you gave to Donna
11  Owen?
12    A    For what period again?
13    Q    For the bonus to be paid in February of 2002
14  which was for the 2001 year.
15    A    I recall what rating I gave her.
16    Q    What was that?
17    A    2.9.
18    Q    Is that the job performance evaluation
19  rating or is that the rating for the bonus?  Or are they
20  one in the same?
21    A    The rating that I assign is for job
22  performance.
23    Q    And do you assign any rating for bonus
24  purposes?  Other than the evaluation.
25    A    No.

11 (Pages 38 to 41)

December 4, 2003

Wayne Grant

Page 50

1　Q　And you feel that she had more SKUs?
2　A　Absolutely.
3　　　MS. OWEN: We're talking about base.
4　BY MR. HAYGOOD:
5　Q　With regard to the sales force, was there
6　bonus incentive base primarily on volume?
7　　　MR. HAYGOOD: Object to form.
8　BY THE WITNESS:
9　A　I don't know.
10　Q　Did you ever know?
11　A　Yes.
12　Q　You just don't recall right now?
13　A　I recall that volume was a component of the
14　sales bonus program.
15　Q　Do you recall that the sales employees were
16　more concerned with volume than the marketing employees
17　who were more concerned with profitability? Would that
18　be a safe description?
19　A　I would say it varied in both departments on
20　an individual basis.
21　Q　Was Donna Owen instructed to emphasize
22　profitability over volume?
23　A　Everybody in my group was advised by me and
24　directed by me that both volume and profit are important
25　and that our job is to deliver whatever the goals are in

Page 51

1　both.
2　Q　Now if you have -- Do you recall if there
3　were any capacity issues with regards to Donna Owen's
4　lines?
5　A　Yes.
6　Q　And when capacity is an issue, would you
7　have desired that a profitable line be used for that
8′　precious capacity rather than a sale that was not going
9　to be profitable -- as profitable?
10　　　MR. HAYGOOD: Object to form.
11　BY THE WITNESS:
12　A　Define profitable for me.
13　Q　What's it mean to you?
14　A　A whole range of things.
15　Q　I see.
16　　　So to you, did profitability play any role in
17　deciding how to use what capacity was available for these
18　product lines?
19　A　Absolutely.
20　Q　What role did it play?
21　A　It's a consideration.
22　Q　A very important consideration?
23　A　It's part of everything that you consider.
24　Q　Yes, I understand that. And is it a very
25　important consideration?

Page 52

1　A　It's important.
2　Q　Would you agree that the souffle line was or
3　near capacity while Ms. Owen was handling the souffle
4　line?
5　A　I would agree that it's been at or near
6　capacity for the last 15 years.
7　Q　Would you agree that Donna Owen's portfolio
8　was growing in profitability relative to the other
9　product lines?
10　A　No.
11　Q　While she was working on it?
12　A　Relative to the other product lines?
13　Q　Other product lines, yes.
14　A　No, I wouldn't agree to that.
15　Q　Were the other product lines profitable?
16　A　Again, define profitability.
17　Q　How do you define it?
18　A　Again, I can define it a number of different
19　ways.
20　Q　Would you say it's the balance of good
21　margin versus needed volume?
22　A　Well would you agree or disagree with the
23　statement that Donna Owen's portfolio was growing in
24　terms of profitability while she was there?
25　A　I would agree that the variable contribution

Page 53

1　coming out of the base plastics portfolio that she had
2　responsibility for was growing.
3　Q　In profitability?
4　A　In variable contribution, yes.
5　Q　Was that in large part because she was
6　stressing taking on profitable business rather than
7　volume for volume's sake?
8　　　MR. HAYGOOD: Object to form.
9　BY THE WITNESS:
10　A　No, it was primarily driven by two things
11　that she did not have responsibility for.
12　Q　What were those?
13　A　One was a broad based price increase on
14　plastics and the other primary driver was cost reduction
15　programs initiated by our operations group.
16　Q　Do you recall which product portfolio in the
17　years 2000 to 2002 had the highest incidents of quality
18　issues?
19　A　No.
20　Q　Would it have been a line that Donna Owen
21　was working on?
22　A　In which year?
23　Q　2000 to 2002. Those three years.
24　A　Potentially it could have been, yes.
25　Q　Did you give Donna Owen any instructions on

14 (Pages 50 to 53)

OWEN v GEORGIA-PACIFIC

December 4, 2003                                              Wayne Grant



Page 54

1   taking on new business?
2          MR. HAYGOOD:  Object to form.
3   BY THE WITNESS:
4      A    I don't recall any specifics.
5      Q    How about in general?
6      A    In general I advised everybody in my group
7   that our bias is to bring on new business that delivers
8   comparable or better than our current return.
9      Q    And --
10     A    In a particular category.
11     Q    And by having a better than particular
12  return, does that mean you're going to make more money on
13  those sales?
14     A    Yes, that's correct.  So that was my
15  guideline.
16     Q    Do you recall there being any tension
17  between your department and the sales department over the
18  issue of volume versus profitability?
19     A    Yes.
20     Q    What can you tell me about that?  What do
21  you recall about that?
22     A    There exists an inherent tension in our
23  organization between sales and marketing relative to
24  volume and bottom line profit or IFO and both groups have
25  responsibility to deliver both.  But when you slice it a

Page 55

1   little further than that, the bias for our sales
2   organization is to deliver volume and the bias for the
3   marketing organization is to deliver profit.  And in both
4   cases, the bias is not a -- is a shade as opposed to a
5   huge shift bias one way or the other.
6      Q    Now this tension that you describe between
7   sales and marketing and the fact that there are certain
8   capacity constraints, did that lead to any conflicts
9   between the two organizations?
10         MR. HAYGOOD:  Object to form.
11  BY THE WITNESS:
12     A    How is conflict different than tension?
13     Q    It's a different word, it's perhaps a higher
14  degree of tension if as a result of this tension between
15  the two departments and when you throw into that the
16  capacity restraints.  My question is, did that lead to
17  any issues, any conflicts between the two organizations
18  as they pursue their respective agendas?
19     A    I think it has had and has potential to.
20     Q    Have there been disagreements over sales
21  because of this tension as to what is going to be used --
22  What that capacity is going to be used for with one
23  department saying we want the sale regardless of profit
24  and the other department saying we want profitable sales?
25     A    Sure, that's part of the ongoing tension

Page 56

1   between sales and marketing.  It exists in the business
2   throughout those two departments.
3      Q    Do you recall if the sales force wanted
4   lower prices than Donna Owen was willing to give them for
5   their product?
6          MR. HAYGOOD:  Object to form.  You
7   can answer.
8   BY THE WITNESS:
9      A    I recall specific -- I don't recall the
10  specifications, but I recall that there were times where
11  a sales person would ask for a price that would be lower
12  than Ms. Owen was willing to give.
13     Q    Do you recall if it happened more than that
14  one time?
15     A    Yes.
16     Q    Do you recall that there were frequent
17  instances when the sales department wanted lower prices
18  than Donna Owen was willing to give them?
19         MR. HAYGOOD:  Object to form.  You
20  can answer.
21  BY THE WITNESS:
22     A    I would say no more frequent than many of
23  the other lines that other people were managing.
24     Q    When this happened, when the sales
25  department wanted a lower price than marketing was

Page 57

1   willing to give them, did that aggravate the sales force
2   because they weren't getting the prices they wanted and
3   they couldn't get their volume on their sales?
4          MR. HAYGOOD:  Object to form.
5   BY THE WITNESS:
6      A    Not necessarily.
7      Q    But sometimes it happened?
8      A    Sure.  Yes.
9      Q    Were you aware that Donna Owen had
10  complained to human resources about you?
11     A    I was aware of that on one occasion.
12     Q    When was that?
13     A    It was some time after a phone call
14  discussion that Ms. Owen and I had.
15     Q    What year?
16     A    Some time during 2001.
17     Q    First half?  Second half?
18     A    Middle of the year some time.
19     Q    Mid 2001.
20         How did you learn that she had complained to
21  HR about you?
22     A    I was advised by Laurie Richman.
23     Q    What did she tell you?
24     A    Who was my HR manager.
25         She told me that Donna had called her and

15 (Pages 54 to 57)

December 4, 2003

Wayne Grant



Page 58

1   explained that we had had a heated discussion over the
2   phone and that -- and Laurie told me that Donna felt she
3   was going to be -- Donna was concerned she was going to
4   be fired.
5        Q    What else did she say?
6        A    That's all I remember.
7        Q    What did you say?
8        A    I said we did have that discussion but she's
9   not being fired.
10       Q    Had you already formed the belief at that
11  point that she should be fired?
12       A    Well I think I said before that I had
13  recommended that she be terminated early that year.
14       Q    And yet you told Laurie Richman that she
15  wasn't being fired?
16       A    That's correct.
17       Q    Did you have any other discussions with
18  Laurie Richman regarding Donna Owen's complaints to her
19  about you?
20       A    None that I recall.
21       Q    Your conversation with Laurie Richman, was
22  that on the phone or was that in person?
23       A    That was in person.
24       Q    At whose office?
25       A    In my office.

Page 59

1        Q    Did you take any notes of the conversation?
2        A    No.
3        Q    Did you speak to Donna Owen after you spoke
4   with Laurie Richman?
5             MR. HAYGOOD: Object to form.
6   BY THE WITNESS:
7        A    I spoke to Donna Owen a lot after I spoke
8   with Laurie Richman at that time.
9        Q    With regards to the phone call from Laurie
10  Richman and the complaint that Donna Owen had raised, did
11  you discuss that with --
12       A    I did not speak to Donna about my discussion
13  with Laurie Richman.
14       Q    Are you familiar with the TPM
15  Georgia-Pacific policy?
16            MR. HAYGOOD: Object to form.
17  BY THE WITNESS:
18       A    I'm familiar with Total Performance
19  Management which a lot of people refer to as TPM. I'm
20  familiar with it as a performance program, not as a
21  policy.
22       Q    Did you follow that TPM program with regard
23  to Ms. Owen?
24       A    No, I did not. It did not apply to her.
25       Q    Why not?

Page 60

1        A    She was not employed at Georgia-Pacific when
2   we began to use TPM in Dixie.
3        Q    When was it first used?
4        A    Used where?
5        Q    Well I believe you just testified it didn't
6   apply to her because she wasn't employed at the time?
7   Did I get that correct?
8        A    She wasn't employed, that's correct, by
9   Dixie.
10       Q    When was it first used at Dixie?
11       A    I don't know when it was first used at
12  Dixie. I know when I was required to first use it at
13  Dixie.
14       Q    When was that?
15       A    I was first required to use it at Dixie for
16  annual reviews for the year 2002.
17       Q    I'm going to hand you Defendant's Exhibit 10
18  which was used at Donna Owen's deposition. Can you
19  identify that exhibit?
20       A    This looks to be a printout of information
21  that is on the Georgia-Pacific intranet relative to Total
22  Performance Management.
23       Q    Do you know when you first saw this?
24       A    This printout?
25       Q    No, no, the Total Performance Management

Page 61

1   program on the Internet or when you first learned of it?
2        A    I first went to this web site on the GP
3   intranet in July of 2002.
4        Q    How did you learn of the TPM?
5        A    I was told by my boss, Mike Dunn, that we
6   were going to use the TPM system in Dixie Foodservice in
7   2002.
8        Q    When did he tell you that?
9        A    July of 2002.
10       Q    And how do you remember that date so well?
11       A    I don't know.
12       Q    Do you see the date on the bottom right-hand
13  corner of each page of Defendant's Exhibit 10?
14       A    Yes.
15       Q    What does the date say?
16       A    It says March 1st, 3/1/2002.
17       Q    Do you know what that date normally
18  indicates on a Georgia-Pacific document?
19       A    Well I don't know that this is a
20  Georgia-Pacific document.
21       Q    Well if I could direct your attention to the
22  first page on the top left it says Georgia-Pacific
23  intranet.
24       A    Right.
25       Q    Would that suggest that it's a program being

16 (Pages 58 to 61)

OWEN v GEORGIA-PACIFIC

December 4, 2003

Wayne Grant

Page 62

1  used by Georgia-Pacific?
2      A    Yes.
3      Q    Would the date March 1, 2002 on the bottom
4  right-hand corner suggest that's the date that the policy
5  took effect?
6      A    No.
7      Q    What would it mean to you?
8      A    It means this -- What does this mean to me?
9      Q    Yes, that date, March 1, 2002.
10     A    That the printer that printed this out and
11 the settings in the program that asked for this to print
12 out are set up in such a way that you get the date that
13 it printed out on the bottom.
14     Q    Oh, okay.
15         So it presumably could have been there much
16 earlier than the date on the bottom right-hand corner?
17         I need an audible answer.
18     A    Yes, it could have been.
19     Q    Is it -- Do you recall whether the Dixie
20 support groups started using the TPM in the fall of 2001?
21     A    Who were the Dixie support groups?
22     Q    Finance?
23     A    I don't recall.  I have no knowledge of
24 that.
25     Q    If I could turn your attention to Exhibit

Page 63

1  11, the Defendant's Exhibit 11 from Ms. Owen's
2  deposition.  This one is entitled termination of
3  employment.  Have you seen this document before?
4      A    No, I have not.
5      Q    You're not familiar with that policy; is
6  that what you are saying?
7          MR. HAYGOOD:  Object to form.
8  BY THE WITNESS:
9      A    I am not familiar with this document and I'm
10 not sure which policy you're talking about.
11     Q    I'm referring to the termination of
12 employment policy as it's stated on the top of
13 Defendant's Exhibit 11.
14     A    I am not familiar with that policy.
15     Q    So obviously you didn't consider it in
16 recommending the termination of Ms. Owen, correct?
17         MR. HAYGOOD:  Object to form.  You
18 can answer.
19 BY THE WITNESS:
20     A    I did not consider this document or policy
21 in my recommendation to terminate Ms. Owen.
22     Q    Was Ms. Owen -- Did you recommend that
23 Ms. Owen be fired in part for her being assertive?  Too
24 assertive, if you will?
25     A    No.

Page 64

1      Q    Did you view her being assertive as being a
2  strength or a weakness?
3      A    I view assertiveness as a strength.
4      Q    And did you feel that she was assertive?
5      A    I felt on occasion she was assertive, yes.
6      Q    What else can you tell me that you felt was
7  good about her job performance, if anything?  Or was it
8  all bad except for being assertive once in a while?
9      A    I think I've outlined all of that in the
10 three reviews that you've seen.
11     Q    Anything else?
12     A    Nothing other than what's documented in
13 those reviews.
14     Q    If I could direct your attention to
15 Defendant's Exhibit 15.
16         Can you identify Defendant's Exhibit 15 for
17 me?
18     A    Yes.  This is a performance evaluation that
19 I authored relative to Donna Owen's performance.  And
20 it's dated July 28th, 2000.
21     Q    How did you come up with a 2.9 rating?
22     A    In this particular review?
23     Q    Yes.  Is that just an entirely subjective
24 rating or is it somehow based on something?  All I see at
25 the bottom left is rating 2.9.

Page 65

1      A    The rating -- for this review during this
2  period of time, the rating has -- the rating system had
3  some degree of subjectivity to it, yes.
4      Q    So the rating went from what number to what
5  number?
6      A    The ratings during this period of time
7  ranged from -- were on a scale of one to five.
8      Q    And you just pick a number out of one to
9  five or is there any way that you get to the 2.9?
10     A    No.  Each of the whole number -- Each of the
11 whole numbers have -- are defined on a chart and they
12 indicate -- they have some words next to them that are
13 guidelines from Fort James describing, you know,
14 performance in each of these whole numbers.
15     Q    Is that normally attached to an evaluation
16 like this?
17     A    Not normally.
18     Q    And what is a three rating?
19     A    A 3.0 rating in Fort James says that you are
20 doing your job, you are meeting your objectives, you're
21 performing the job as it is expected to be performed.
22     Q    What's a 4.0?
23     A    4.0 says you are exceeding many of your --
24 many of the requirements of your job --
25     Q    5.0?

17 (Pages 62 to 65)

OWEN v GEORGIA-PACIFIC

December 4, 2003                                                      Wayne Grant

Page 70

1    A    I believe 2.6.
2    Q    And my question is, was your rounding down
3    from 2.6 to 2.0 based on that chart?
4    A    Yes.
5         (Recess taken at 12:27 p.m.)
6         (Plaintiff's Exhibit A was marked
7    for identification: Intracompany memo of
8    May 14, 2001.)
9         (Plaintiff's Exhibit B was marked
10   for identification: Letter of July 9,
11   2002.)
12        (Plaintiff's Exhibit C was marked
13   for identification: Memo of June 17,
14   2002.)
15        (Plaintiff's Exhibit D was marked
16   for identification: Letter of February 1,
17   2001.)
18        (Plaintiff's Exhibit E was marked
19   for identification: Annual forecast 2002,
20   D 01117.)
21        (Plaintiff's Exhibit F was marked
22   for identification: Food service incentive
23   calculation, D 01118.)
24        (Plaintiff's Exhibit G was marked
25   for identification: Interoffice

Page 71

1    correspondence, period 32002 letter, D
2    01121.)
3         (Plaintiff's Exhibit H was marked
4    for identification: Handwritten document
5    beginning 3/18/02.)
6         (Plaintiff's Exhibit I was marked
7    for identification: Rating form for exempt
8    job level G-H, D 01104.)
9         (Reconvened at 1:34 p.m.)
10   BY MR. HORNER:
11   Q    You understand you are still sworn in,
12   Mr. Grant?
13   A    Yes.
14   Q    If we could turn to Defendant's Deposition
15   Exhibit No. 9, the Civil Treatment for managers, what was
16   referred to as the resource manual. Mr. Grant, I hand
17   you that exhibit and ask you if you can identify it,
18   please?
19   A    It says, title, Civil Treatment for
20   managers.
21   Q    Have you ever seen it before?
22   A    I saw it at Ms. Owen's deposition.
23   Q    Did you see it during the time that Donna
24   Owen worked for Georgia-Pacific?
25   A    I don't know that I saw this book.

Page 72

1    Q    Do you recall ever taking a class or
2    training with regards to the content of that book?
3    A    I recall taking a class for -- that was
4    titled Civil Treatment for managers.
5    Q    Do you remember how long that class lasted,
6    approximately?
7    A    Slightly less than one full day.
8    Q    Do you recall when that day was?
9    A    No, I don't.
10   Q    Do you remember what year?
11   A    No, I don't.
12   Q    Do you remember if it was before Donna Owen
13   was discharged which was April 15th, 2002?
14   A    Yes, I believe it was.
15   Q    Did you consider this manual when you
16   recommended the discharge of Donna Owen to Mr. Dunn?
17        MR. HAYGOOD: Object to the form of
18   the question.
19   BY THE WITNESS:
20   A    No, I did not.
21   Q    Did you follow any steps in the resource
22   manual with regards to your supervision of Donna Owen and
23   her performance?
24        MR. HAYGOOD: Object to the form of
25   the question.

Page 73

1    BY THE WITNESS:
2    A    Not to my knowledge.
3    Q    Did you receive a copy of Defendant's
4    Exhibit 9 as a result of taking that almost full day
5    class?
6    A    Not that I recall.
7    Q    Did you ask human resources of
8    Georgia-Pacific at any time for a copy of the resource
9    manual?
10   A    No, I did not.
11   Q    Did you attend any of the meetings in March
12   of 2002 where Mr. Schultz addressed the employees
13   regarding the relocation down to Atlanta, Georgia?
14   A    Yes, I did.
15   Q    Do you know if you attended the same meeting
16   that Donna Owen attended?
17   A    I don't remember.
18   Q    Do you recall hearing Mr. Schultz say
19   something to the effect to the employees in the room you
20   have the same job, it's just in Atlanta?
21   A    I don't recall that specifically.
22   Q    What do you recall along those lines, if
23   anything?
24   A    I recall Bill Schultz describing that the
25   Dixie business will be relocating to Atlanta.

19 (Pages 70 to 73)

OWEN v GEORGIA-PACIFIC

December 4, 2003

Wayne Grant



Page 94

```
 1     A     Variable contribution.
 2     Q     How does that differ from IFO contribution?
 3     A     It is profitability prior to several
 4  typically fixed items.
 5     Q     Was there some reason why when you gave her
 6  that goal in Defendant's Exhibit 20 when you said she
 7  needs to deliver the 2001 IFO for plastics that that
 8  wasn't demonstrated right here on the evaluation for how
 9  she did for 2001?
10     A     IFO by product line was not available for
11  the year 2001 during the first quarter of 2002. In fact,
12  I don't know if it was ever made available. So I made a
13  decision to substitute this measure of profitability
14  which in every case for every person I evaluated was a
15  more favorable measure than IFO.
16     Q     Including Donna Owen?
17     A     Including Donna Owen.
18     Q     This statement here, variable contribution
19  was 12,552 M, which I assume is million?
20     A     M is actually thousands. So it's 12
21  million.
22     Q     So 12,552,000. Thank you.
23     A     Yes.
24     Q     Plus 649 million?
25     A     Yes.
```

Page 95

```
 1            MR. HAYGOOD:  Wait a minute.
 2  Thousand.
 3            MR. HORNER:  Excuse me.  Thousand,
 4  thank you.
 5  BY MR. HORNER:
 6     Q     Plus 5 percent versus plan.  What does that
 7  mean?
 8     A     That means that variable contribution, the
 9  absolute number was 12,552,000 bucks and that was
10  $649,000 greater than or 5 percent greater than what we
11  had in our plan.
12     Q     So that's good news?
13     A     That's good news.
14     Q     Now you said earlier during your testimony
15  that when you evaluated Ms. Owen for 2001 that her rating
16  was 2.6.  Did I understand that correctly?
17     A     I believe that's what I said, yes.
18     Q     And then due to some rounding down process
19  that it was moved all the way down to a 2 rating,
20  correct?
21            MR. HAYGOOD:  Object to form.
22  BY THE WITNESS:
23     A     Yes.  There was a chart that I had that
24  indicated the Georgia-Pacific method for converting
25  decimal ratings to whole number ratings.  And I used
```

Page 96

```
 1  that.
 2     Q     How did you get to 2.6 in the first place?
 3     A     Through a weighting in my mind of various
 4  puts and takes.  It's a subjective rating.  Tied
 5  directionally -- tied to the whole number system that I
 6  described before.
 7     Q     And what percentage of her evaluation was
 8  based on the IFO contribution?
 9     A     I don't remember.
10     Q     Is it a significant portion of one's
11  evaluation?  Is it unimportant?  How would you describe
12  it?
13     A     I would describe volume and IFO being
14  equally important.  Our job's to deliver both.  In this
15  particular case she made one, she missed the other.  In
16  addition to that, there are a number of other things that
17  are evaluated.
18     Q     What's most important on the evaluation?  Is
19  it your numbers or other aspects?
20     A     For a product manager, there are a number of
21  things that are equally important.  There's not one thing
22  that is mostly important.
23     Q     Okay.  How did the department as a whole do,
24  your department with regards to variable contribution?
25     A     During this period?  2001?
```

Page 97

```
 1     Q     Yes, 2001.
 2     A     I don't recall.
 3     Q     Do you remember if it was up or down?  In
 4  general.
 5     A     In total?
 6     Q     Yes, in total.
 7     A     I don't recall.
 8     Q     Of the five product managers reporting to
 9  you, do you recall how many had plus percentage variable
10  contribution for 2001?
11     A     Plus percentage to plan?
12     Q     Yes.
13     A     No, I don't recall.
14     Q     Do you recall how cutlery did?
15     A     No.
16     Q     Was it --
17     A     I do not.
18     Q     Was it considerably below plan?
19     A     I don't recall.
20     Q     Let me hand you what has been marked as
21  Plaintiff's Exhibit H.  It's a multi-paged document, the
22  cover sheet is a handwritten memo to Wayne from Donna.
23     A     It's got a red pen circle on it as well.
24     Q     Okay, well just ignore any handwriting.
25     A     Okay.
```

25 (Pages 94 to 97)

OWEN v GEORGIA-PACIFIC

December 4, 2003                                                  Wayne Grant

**Page 110**

1   Q   Under Owen it says plastics?
2   A   I see that.
3   Q   So I think we're talking about plastics here
4 or am I misreading it somehow?
5        MR. HAYGOOD: Objection. I think his
6 testimony has been -- you can ask him anything you
7 want to about this document, but I think he testified
8 over and over again he's not familiar with this
9 document.
10        MR. HORNER: He said he received one
11 himself.
12        MR. HAYGOOD: If you want to ask him,
13 that's fine, but I'm just saying.
14        MR. HORNER: I understand.
15 BY MR. HORNER:
16   Q   Would you say this document relates to
17 plastics?
18   A   I would agree that one column relates to
19 plastics.
20   Q   And which column would that be?
21   A   It would be the column under volume entitled
22 plastics.
23   Q   And that one shows 111 percent actual to
24 plan?
25   A   That's correct. That's what it shows.

**Page 111**

1   Q   Is that -- How would you describe that
2 increase?
3   A   I would describe that as beating plan.
4   Q   Is that good?
5   A   It's good to beat plan.
6   Q   Do you know who provides these documents to
7 the employees? You said you received one, Ms. Owen
8 received one. Do you know where they come from?
9   A   I do not know where this document came from.
10   Q   Do you have any reason to doubt that it's an
11 official Georgia-Pacific document?
12        MR. HAYGOOD: Objection.
13 BY THE WITNESS:
14   A   What do you mean by official Georgia-Pacific
15 document?
16   Q   Authentic, legitimate.
17        MR. HAYGOOD: Object to the form of
18 the question.
19 BY THE WITNESS:
20   A   What was the question again?
21        MR. HAYGOOD: Could you read that
22 back, please.
23        (The last questions and answers were
24 read.)
25 BY THE WITNESS:

**Page 112**

1   A   I have no reason to doubt that this is a
2 worksheet that was prepared either by a Georgia-Pacific
3 employee or on behalf of Georgia-Pacific.
4   Q   I hand you what has been marked Plaintiff's
5 Exhibit G and ask you if you can identify this document?
6   A   This is period 3, 2002 letter which is a --
7 this is a monthly letter what sometimes is referred to as
8 a manager's letter. And this particular one is one that
9 I wrote to my boss, Mike Dunn.
10   Q   And you write these each month?
11   A   I prepare a letter each month, not
12 necessarily in this particular form.
13   Q   But each month you would have a letter of
14 some sort going to Mr. Dunn regarding volume and margin
15 results?
16   A   Not necessarily including volume and margin
17 results.
18   Q   Would they be at least quarterly that you
19 would send such letter to Mr. Dunn?
20   A   I would certainly try.
21   Q   Okay.
22   A   It was not a requirement.
23   Q   Period 3, does that stand for third quarter?
24   A   No. That stands for the third period of the
25 fiscal year 2002 and Georgia-Pacific's on a calendar

**Page 113**

1 year, so it's March. March of 2002.
2   Q   So this is as of the end of March 2002?
3   A   That's correct.
4   Q   And this document refers to base plastics;
5 is that correct? I'm looking at --
6   A   There is some information here out on base
7 plastics.
8   Q   The middle of the page --
9   A   Volume performance, yes. And then this
10 document also goes on to -- there is there's some
11 verbiage which --
12   Q   Before we go on to verbiage, the numbers for
13 the base plastics, are those favorable numbers?
14   A   Yes, those are positive to plan and positive
15 to year ago. Those are favorable.
16   Q   Was this in an area that Donna Owen worked
17 in?
18   A   This was the business that she worked in,
19 yes.
20   Q   Now on the bottom under volume, it says
21 volume continues to be strong.
22   A   Mm-hm.
23   Q   I assume that's good.
24   A   P 3 was ahead of plan by 3 percent. The
25 gains in cups and base plastics more than offset the

29 (Pages 110 to 113)

OWEN v GEORGIA-PACIFIC

December 4, 2003

Wayne Grant

Page 114

1 softness in cutlery. So I guess there was some softness
2 in cutlery; do you recall that now?
3     A    What do you mean now?
4     Q    Well I think earlier you testified -- I
5 asked you about the cutlery department whether they had a
6 plus or a negative and I thought you testified you didn't
7 recall?
8     A    What period of time was that for?
9     Q    I think the end of 2001. For 2001.
10    A    This relates to 2002.
11    Q    Uh-huh.
12    A    It has nothing to do with 2001.
13    Q    So it's your understanding that cutlery was
14 just soft in 2002, it was not soft in 2001?
15    A    I don't recall.
16    Q    The next paragraph, P3 YTD volume is 4
17 percent ahead of plan, driving 2.8 MM. -- I assume that's
18 million -- incremental margin of 10 percent over plan.
19    A    Mm-hm.
20    Q    These again are good numbers; are they not?
21    A    Yes.
22        MR. HAYGOOD: I'm instructing
23 Mr. Grant to please give yes or no answers.
24 BY THE WITNESS:
25    A    Yes.

Page 115

1     Q    With regard to this document and these
2 numbers on Plaintiff's Exhibit G, would this reflect good
3 performance by Ms. Owen for this time period?
4        MR. HORNER: Object to form. You can
5 answer.
6 BY THE WITNESS:
7     A    This would not necessarily reflect her
8 performance.
9     Q    And why not?
10    A    There are a number of factors that come into
11 play when looking at any of these numbers.
12    Q    Such as?
13    A    There are -- I think I mentioned these
14 before. There are cost reduction programs that go on in
15 operations, oftentimes they can be initiated by
16 operations. Benefits accrue to the businesses. There
17 can be sales initiatives that go beyond any single
18 marketing or product manager's responsibility that can
19 result in large gains of volume or large losses of volume
20 and can have significant impact on the numbers and
21 have --
22    Q    Anything else?
23    A    -- and have next to no relation or have no
24 relation to the performance of a particular product
25 manager.

Page 116

1     Q    Anything else?
2     A    Yes.
3     Q    What?
4     A    There is market growth or market decline for
5 a particular type of product.
6     Q    Anything else?
7     A    If you have position with a customer that's
8 growing, you get that growth. If you have position with
9 the customer that their volume, their business is
10 declining, you get that decline.
11    Q    Anything else?
12    A    There could be new products that had been
13 launched in prior years by other marketing people.
14    Q    Anything else?
15    A    There could be by-ins against announced
16 price increases.
17    Q    Anything else?
18    A    There could be cost reductions negotiated by
19 our procurement department for raw materials, finishing
20 supplies.
21    Q    Anything else?
22    A    Utilities.
23        I think those are the significant ones.
24    Q    Any insignificant ones that you feel are
25 important to mention?

Page 117

1     A    Not that come to mind at the moment.
2     Q    Any other significant ones that you can
3 think of?
4     A    Can you read back the list?
5        MR. HAYGOOD: Object to form.
6 BY MR. HORNER:
7     Q    Of the cost reduction programs in
8 operations, sales initiatives, market growth or decline
9 for particular product, new products launched in prior
10 years by other marketing people, buy-ins against price
11 increases and lastly cost reductions for raw materials.
12    A    What did I specifically say around sales
13 initiatives in the record, please?
14        (Whereby, the last answer was read.)
15 BY THE WITNESS:
16    A    Yeah, I think those are, as best I can put
17 together at the moment, those are the significant ones.
18    Q    Okay.
19        Now during the time period covered by
20 Plaintiff's Exhibit G, what knowledge do you have of any
21 cost reduction programs in operations that may have
22 affected the numbers?
23    A    I have no recollection that's tied to this
24 specific period of time.
25    Q    Okay.

30 (Pages 114 to 117)