

PLAINTIFF'S EXHIBIT
ALL-STATE® INTERNATIONAL

```
 1                UNITED STATED DISTRICT COURT
                            for the
 2                   DISTRICT OF CONNECTICUT
 3
     - - - - - - - - - - - - - - - - - -X
 4
     DONNA OWEN,
 5
                        PLAINTIFF,
 6
             vs.                        3:03CV378 (DJS)
 7
     GEORGIA-PACIFIC,
 8
                        DEFENDANT.
 9   - - - - - - - - - - - - - - - - - -X
10
11
12
13                    D E P O S I T I O N
14         The deposition of DONNA COLUMB OWEN was
15   taken pursuant to notice at the law offices of McCarter &
16   English, Four Stamford Plaza, 107 Elm Street, Stamford,
17   Connecticut, before Viktoria V. Stockmal, license #00251,
18   a notary public in and for the State of Connecticut, on
19   Tuesday, November 25, 2003, at 9:49 a.m.
20
21
22
23
24
25
```

Page 34

1  A  Right. Did you skip over No. 2, though
2  since we are going through this?
3  Q  Number 2 I thought we discussed. The
4  beginning of No. 2 is "The eligible employee remains an
5  eligible employee through his/her designated termination
6  date"?
7  A  Yes.
8  Q  And then it continues.
9  A  Okay.
10 Q  Is that correct?
11 A  Yes.
12 Q  Now I would like to flip to -- I know this
13 is a bit convoluted, but I think it's fairly clear --
14 paragraph 4, which is on page 6, paragraph 4 says, "When
15 is an eligible employee's termination date?" Is that
16 correct, the title?
17 A  Yes.
18 Q  Paragraph 4 begins, "When an eligible
19 employee is going to be terminated under circumstances
20 described in Q&A 3, which make him/her eligible for
21 severance pay under this Plan," which we talked about,
22 then it goes on to say "his/her employer will specify the
23 date as when his/her employment will be deemed to have
24 terminated for purposes of this plan. This date is the
25 eligible employee's termination date, and continuous

Page 35

1  service counted for severance will end on that date." Am
2  I reading that correctly?
3  A  Yes.
4  Q  And that's the termination date you are
5  talking about, December 31st, 2002 would have been your
6  termination date, according to your claim?
7  A  Yes, yes.
8  Q  So the termination date, December 31, 2002,
9  and then after that time the severance benefits that are
10 described in Q&A No. 6?
11 A  Yes.
12 Q  Other than the comments made by Mr. Schultz
13 that we've talked about that are described in paragraphs
14 12 through 14 of your complaint --
15 A  Okay. Yes. Question?
16 Q  -- did Mr. Schultz -- there weren't any
17 other promises made by Mr. Schultz about severance or
18 relocation?
19 A  Those were the only oral from Mr. Schultz.
20 Q  You didn't receive any written promises from
21 Mr. Schultz?
22 A  No.
23 Q  Other than the promise in paragraph 15 by
24 Mr. Dunn -- the alleged promise by Mr. Dunn in paragraph
25 15, there weren't any other promises by Mr. Dunn relating

Page 36

1  to relocation, termination or severance?
2  A  He described it that it would be a win-win
3  situation. When I spoke to Wayne with regards to that,
4  he said it was out of his hands or out of -- out of
5  everyone -- I don't know, out of --
6  Q  Wayne said --
7  A  When I discussed with Wayne about my
8  determination, he said it was out of Mr. Dunn's hands.
9  Q  Other than Mr. Dunn's --
10 A  But that's when I was being let go.
11 Q  When you spoke with Wayne?
12 A  When I was being -- when my -- it became
13 clear that my termination -- not termination --
14 determination was unknown.
15 Q  I'm sorry, when it became clear that your
16 determination was --
17 A  My determination was unknown.
18    Undetermined. That my status was
19 undetermined.
20 Q  When it became clear that your status was
21 undetermined, Mr. Grant said --
22 A  I had a conversation with Wayne with regards
23 to that.
24 Q  Mr. Grant told you your status was
25 undetermined?

Page 37

1  A  Yes.
2  Q  And --
3  A  And I -- I don't remember the conversation
4  exactly, but I remember saying to Wayne, but my
5  understanding with Mike Dunn was that it would end up
6  being a win-win situation either way.
7  Q  And Wayne said it was out of Mr. Dunn's
8  hands?
9  A  As I recall, he commented that it was out of
10 their hands. Meaning, he and Michael Dunn's.
11 Q  Other than the promise described in
12 paragraph 16 -- at least Mr. Dunn's statement in 15,
13 there weren't any other promises by Mr. Dunn?
14 A  I met with him and when I met with him -- he
15 met with everyone. There wasn't per se -- I relied on
16 the win-win discussion. That was all I needed. That was
17 my oral understanding.
18 Q  Right.
19    Other than that, there wasn't anything else?
20 A  Not that I can recall.
21 Q  I would like to turn your attention to page
22 7 of your complaint. It starts "count 1"?
23 A  Yes.
24 Q  Your complaint is organized at the beginning
25 there are paragraphs of facts and then it begins counts.

Page 38

1  A  The counts.
2  Q  Is that correct?
3  A  Yes, I'm familiar with that.
4  Q  Great. "Count one, breach of oral
5  contract," I would like to direct your attention to
6  paragraph 48.
7  A  Mm-hm.
8  Q  Which says, "The defendant made promises in
9  the form of an oral representation which constituted an
10 offer to the plaintiff." Did I read that correctly?
11 A  Yes, you did.
12 Q  And the promises in the form of an oral
13 representation that are described in paragraph 48 are the
14 promises we've just discussed by Bill Schultz and Mark
15 Dunn regarding the transition severance pay plan; is that
16 correct?
17 A  Yes. But to further that, when Mr. Schultz
18 said you have the same job and it's in Atlanta, you need
19 to go there before the end of the month, and I went
20 there, and it was approved, provided oral assurances to
21 me that why would they send me there or why would they
22 let me go there.
23 Q  So you went to Atlanta?
24 A  Oh, yeah.
25 Q  But other than the comments that Mr. Schultz

Page 39

1  made during that meeting --
2  A  His comments and the resulting trip and --
3  Q  The resulting trip. But that wasn't an
4  oral -- the resulting trip wasn't an oral representation?
5  A  No, but the trip was due to the oral
6  representation.
7  Q  From Mr. Schultz that we already talked
8  about?
9  A  Mm-hm. Yes.
10 Q  So you went to Atlanta?
11 A  Yes.
12 Q  But other than Mr. Schultz's promises in
13 that meeting that we've already talked about --
14 A  Right.
15 Q  -- there weren't any other -- and Mr. Dunn's
16 win-win comment, there weren't any other promises?
17 A  Not that I recall.
18 Q  In paragraph 49, the plaintiff was aware of
19 the oral representation and relied on them in the course
20 of her employment. Again, all oral presentation?
21 A  Yes.
22 Q  Mr. Schultz, Mike Dunn, we've already talked
23 about?
24 A  Yes.
25 Q  I would like to direct your attention to --

Page 40

1  just to make certain we are clear here. There aren't any
2  other promises in this breach of contract?
3  A  That's it.
4  Q  Other than this?
5  A  No.
6  Q  I would like to direct your attention to
7  page 12 of your complaint, the very bottom.
8  A  Okay.
9  Q  Which says, "count 6."
10 A  Okay.
11 Q  And then you flip over, "promissory
12 estoppel"?
13 A  Yes.
14 Q  Paragraph 93 is some lawyerly stuff that we
15 do. Paragraph 94, "the defendant made a clear and
16 definite promise of severance benefits to plaintiff."
17 Again, this clear and definite promise that's described
18 in paragraph 94 is the promises from Mr. Schultz and
19 Mr. Dunn regarding transition severance pay plan benefits
20 that we've already talked about, is that correct?
21 A  Yes, that's correct.
22 Q  And paragraph 95 says that you allege "The
23 defendant had reason to expect the plaintiff would rely
24 on the promise and the plaintiff, in fact, did rely on
25 the defendant's promise."

Page 41

1  A  Yes.
2  Q  And again, that promise that's described in
3  paragraph 95 are the promises from Mr. Schultz and
4  Mr. Dunn regarding transition severance pay plan we've
5  already talked about?
6  A  Exactly.
7  Q  Okay, great.
8     We began to talk earlier about your job as
9  product manager.
10 A  Okay.
11 Q  You were a product manager for Dixie Food
12 Service; is that correct?
13 A  Yes.
14 Q  And the duties of a product manager included
15 supporting the sales force?
16 A  Yes.
17 Q  And interfacing with production?
18 A  Yes.
19 Q  And you would interface with the pricing
20 group?
21 A  Yes.
22 Q  And my understanding is that you had prior
23 experience in the food service industry; is that fair to
24 say?
25 A  I actually worked seven years in the food

11 (Pages 38 to 41)

Page 78

```
 1   A    Because there were other projects that could
 2   have been either closer or later than that.
 3   Q    Okay.
 4   A    We all had to work together to know what we
 5   could achieve and what we couldn't. So no, I don't feel
 6   that one is -- So hopefully, I have answered that.
 7   Q    But, nevertheless, timing is important?
 8   A    In anything, yes. Timing is important.
 9   Q    And generally timing in Dixie was -- in
10   Dixie marketing was particularly important?
11   A    Timing in Dixie was always crisis
12   management, yes. So timing was always behind.
13   Q    Absolutely. Always --
14   A    Crisis management.
15   Q    But you guys had a rule that was 48 hour
16   response from project manager to sales if there were
17   inquiries from sales around pricing?
18   A    If possible, yes.
19   Q    Well, that was the rule. Whether or not it
20   was followed all the time is a separate question.
21   A    That's true.
22   Q    But the rule was 48 hour response to sales?
23   A    That was our target, yes.
24   Q    You understood that to be a target?
25   A    As best as I possibly could when you have 50
```

Page 79

```
 1   or 60 coming in as well as... I think I've answered it
 2   for you. So I don't have to go any further.
 3   Q    You understood it was a target?
 4   A    It was a really important target, yes.
 5   Q    It's possible that others understood it to
 6   be a rule?
 7   A    Were others following it? I'm sorry, this
 8   isn't my question. Go ahead.
 9   Q    It's my turn to ask the questions?
10   A    Yeah, go ahead.
11   Q    I understand you yourself -- you're thinking
12   of this as a target. But was it generally discussed as a
13   rule?
14   A    It was a target.
15        THE WITNESS: I need more water.
16        MR. HORNER: Sure, I will get it.
17        MR. HAYGOOD: Let's go off the record
18   for one moment.
19        MR. HORNER: Don't do it for me.
20        MR. HAYGOOD: Okay.
21   BY MR. HAYGOOD:
22   Q    You would agree with me, would you not, that
23   disrespectful behavior can be damaging to communication?
24   A    In either way, yes.
25   Q    In either way? What do you mean?
```

Page 80

```
 1   A    Disrespectful communication from either way.
 2   Q    Either --
 3   A    From you or to me, yes. It's a two-way
 4   street.
 5   Q    It's a two-way street, but in any instance,
 6   disrespectful behavior is damaging in communication?
 7   A    Yes.
 8   Q    You would agree with me that disrespectful
 9   communication could negatively affect job performance?
10   A    I think what could negatively affect job
11   performance is trying to introduce four products that are
12   not ready to be introduced. The capacity is not
13   sufficient and there are issues with quality and supply.
14   That's a cardinal marketing rule. You don't sell product
15   until it's a product.
16   Q    But that had absolutely nothing to do with
17   my question which was would you agree with me that
18   disrespectful communication could negatively affect job
19   performance?
20   A    Not necessarily.
21   Q    It's possible that --
22   A    It's possible.
23   Q    -- that disrespectful communication could
24   negatively affect job performance?
25   A    It depends on who it is, yeah. The rules
```

Page 81

```
 1   were different for different people.
 2   Q    Well --
 3   A    Don't -- that -- forget it.
 4   Q    All I'm asking is --
 5   A    Yes.
 6   Q    -- is it possible that disrespectful
 7   communication can negatively affect job performance?
 8   A    Sure.
 9   Q    If a person engages in disrespectful
10   communications, you would agree with me that that could
11   be the subject for their job evaluation or could affect
12   negatively their job evaluation?
13   A    It could be part of it, yes.
14   Q    In your job, it was important to establish
15   leadership in the product manager position; is that
16   correct?
17   A    It was important -- leadership was a target,
18   yes, a goal.
19   Q    Leadership was a goal?
20   A    Mm-hm.
21   Q    Were you expected to be a leader?
22   A    Yes.
23   Q    And you were expected to be a leader of the
24   plastics category?
25   A    Yes.
```

Page 138

1   Q   Now the paragraph 32 says "Grant negligently
2   violated the TPM which calls for open and frequent
3   dialogues between employee and reviewer"; and you point
4   to page 10.
5   A   We didn't actually --
6   Q   Page 1, I'm sorry. You refer to page one.
7   A   Page 1. This?
8   Q   My question.
9   A   I'm sorry, stay that again.
10      MR. HORNER: You are referring to
11  paragraph 32?
12      MR. HAYGOOD: I'm referring to
13  paragraph 32.
14  BY MR. HAYGOOD:
15  Q   You say that "Grant also negligently
16  violated the TPM which calls for open and frequent
17  dialogues between employee and reviewer because he
18  totally failed to provide such dialogues." And then you
19  cite page 1.
20  A   Yes. This wasn't followed for our
21  department. That's what I'm saying. Yes.
22  Q   Page 1, you're referring to page 1 of this
23  document?
24  A   I'm referring to this entire document, yes.
25  Q   There a specific reference -- you are

Page 139

1   referring, I believe, in the middle of this Total
2   Performance Management, it's probably actually two-thirds
3   down the page the paragraph beginning, "Key to the
4   success of TPM is progress reviews -- open and frequent
5   dialogues between the employee and reviewer"?
6   A   That was part of it, yes.
7   Q   Is that what you are referring to on
8   paragraph 32?
9   A   Yeah, that looks like that's what it is.
10  Q   Is there anything else you are referring to
11  in paragraph 32?
12  A   Yes.
13  Q   What else are you referring to?
14  A   With regards to statement 32?
15  Q   Yes, ma'am.
16  A   The only thing I'm citing here is the open
17  and frequent dialogues.
18      However, and let's see if that's covered
19  anywhere else --
20  Q   Wait just a second. Paragraph 32, the only
21  thing that you are citing is the sentence two-thirds down
22  the page that begins, "Key to the success of TPM"; is
23  that correct?
24  A   I don't know. I would to have read through
25  all this to see if it's identified anywhere else. I'm

Page 140

1   not saying that to anger you, but --
2   Q   That's fine, you can read through it if you
3   would like. I just want to know what you are referring
4   to?
5   A   I'm referring to this. I'm referring to the
6   key drivers are the reasons why the job exists.
7   Q   What page are you on?
8   A   Two of 12.
9   Q   Two of 12. And you are referring to key
10  drivers.
11  A   The integration of individual or team key
12  drivers.
13  Q   I'm sorry, I don't see --
14  A   I'm sorry. Key drivers is about halfway
15  down under key drivers. "Key drivers are the reason the
16  job exists."
17  Q   Second paragraph on page 2, yes. "Key
18  drivers are the reason the job exists"?
19  A   The paragraph underneath that talks about
20  the integration of individual within the division of the
21  department is critical to meeting the company's strategic
22  objectives.
23  Q   You are referring to that in paragraph 32 of
24  your complaint?
25  A   That -- it refers to, not only open and

Page 141

1   frequent dialogues, but it also refers to the TPM process
2   as a whole. And I think that's reflected someplace else
3   in one of these other numbers.
4   Q   So is there anything else that you're
5   referring to in paragraph 32? You refer to page 1.
6   A   And then I just referred to page 2.
7   Q   I understand. You just -- in your
8   deposition you just referred to page 2 and you said you
9   were also when you talked about Grant negligently
10  violating TPM identified key drivers and integration of
11  individuals on page 2. I'm just trying to figure out
12  what you're claiming in paragraph 32.
13  A   Those are the two.
14  Q   Okay.
15      Paragraph 33 says, "TPM was provided to
16  companies, managers and to the plaintiff and they were
17  told to follow its contents with regard to supervising
18  and disciplining their employees." You didn't have any
19  direct reports; did you?
20  A   No, I don't have any -- did not have any
21  direct reports.
22  Q   So you weren't told to follow its contents
23  with regard to supervising and disciplining any
24  employees?
25  A   But it was that particular policy for people

Page 142

1  with direct reports was available. So I know that it was
2  part of the policy with regards to supervising and
3  disciplining employees with direct reports. I knew of
4  his -- the expectations of the company upon my direct
5  supervisor.
6     Q    And were you present for any meetings with
7  anybody else from the company than Mr. Grant to discuss
8  TPM?
9     A    Yes. When we changed from Fort James to
10 Georgia-Pacific.
11    Q    When?
12    A    Well, you know, when a company buys another
13 company -- this is also my fourth time I've been in a
14 company or maybe third time that a company had been
15 bought out. Not everything happens on day 2. So to tell
16 you the exact date of when we switched, I couldn't really
17 tell you that. All I know is my reviews really didn't
18 follow a formulation that they were supposed to follow.
19 And I wasn't provided with the basis for what those
20 numbers were that applied to it. But that the programs
21 that were available to be used were there. I knew where
22 they were. But our particular group was not using them.
23    Q    You said that you were in a meeting with
24 Wayne Grant when direction was given about TPM. I would
25 like to know when that meeting took place?

Page 143

1     A    Oh, God. I have no idea.
2     Q    Who was in the meeting?
3     A    I have no idea. I don't -- honestly, I
4  don't -- it was probably human resources.
5          MR. HORNER: Please don't guess.
6  BY MR. HAYGOOD:
7     Q    Do you know?
8     A    I don't know -- I don't even remember -- I
9  have no recollection. All I know is it changed, I
10 couldn't tell you when it changed. All I knew was it
11 wasn't being used. I really wish I could tell you that,
12 but I really don't know.
13    Q    It's possible that there wasn't a meeting
14 where you were in with Wayne Grant where he was given
15 direction?
16    A    I'm sure I was not in a meeting with him in
17 which he was given direction. I was in a meeting
18 probably from human resources that said this is now how
19 we are going to handle annual evaluations through this
20 new process.
21    Q    So you're --
22    A    It was a general overview of the new policy
23 and procedure of how it was going to be handled.
24    Q    You were in a meeting with human -- with
25 someone you don't know, who it was --

Page 144

1     A    The division. It was a division meeting.
2  It was --
3     Q    But you don't recall who the presenter was?
4     A    No.
5     Q    But you're not claiming that you were in a
6  meeting when Mr. Grant was given direction about TPM?
7     A    No. I wasn't claiming that.
8     Q    Okay.
9     A    I'm claiming this is a policy that he was
10 aware of that everyone around us was using.
11    Q    Do you have firsthand knowledge of any --
12 that Mr. Grant was even aware of TPM?
13    A    Everyone around us was using it.
14    Q    But you don't have firsthand knowledge?
15    A    I don't -- he should have known.
16    Q    But you don't know for sure, one way or the
17 other?
18    A    I can't tell you. I can't tell you that.
19 That's right. I'm not Wayne Grant. I wasn't in his
20 shoes at the time. So I can't tell you what he knew or
21 didn't know.
22    Q    I would like to direct your attention to
23 paragraph 36.
24    A    Although I do know that I did ask Laurie
25 Richman about TPM and that for some reason we weren't --

Page 145

1  we weren't going in this direction and her comment was we
2  can only give them the information. We can't make them
3  follow it.
4     Q    When was that meeting?
5     A    It was probably in the fall, at some point.
6     Q    Do you remember, specifically?
7     A    I don't.
8     Q    It's possible that it was in early 2002?
9     A    It was before 2002.
10    Q    How do you know?
11    A    Because I had gotten several performance
12 reviews over the year and a half and that the process
13 for -- he had his own process of reviewing me and it
14 didn't change when we had the division meeting to show
15 how these things were going to be handled.
16    Q    But you're not sure when you had the meeting
17 with Ms. Richman?
18    A    I had many meetings with Ms. Richman.
19    Q    But you're not sure when this meeting with
20 Ms. Richman took place?
21    A    No, I don't. I would to have think about it
22 for a while to figure it out. It was either -- it was
23 between July of '00 -- I'm sorry, '01. It was probably
24 around July of '01, because July of '01, I had a review,
25 I believe, and it wasn't following these prescribed

37 (Pages 142 to 145)

Page 150

1  executed. So that means the policy as a whole and not
2  one individual paragraph of it.
3     Q   And that's because it was your understanding
4  that TPM was to be implemented -- that your 2001 review
5  was supposed to be under TPM?
6     A   Reviews were supposed to change over to TPM.
7  I don't know when they were supposed to change over.
8  That's... that was something people with direct reports
9  were to advise us of and when it was going to occur.
10 They did it at a divisional level. I don't recall it
11 being done on an individual level.
12    Q   You claim that Grant failed to spend any
13 time with you and provide coaching?
14    A   There were a lot of differences in the way I
15 was treated versus other people. There were two major
16 portfolios there was focus on: Perfect Touch and the
17 plastics portfolio. Sharon Tett was in charge of the
18 Perfect Touch portfolio and I was in charge of the
19 plastics portfolio. Wayne was very adept as being a
20 product manager and he was very good at aiding Perfect
21 Touch and where it was going. We lacked a lot of
22 resources to get a lot of things accomplished.
23    Q   That was across Dixie?
24    A   Across Dixie. But plastics was the number
25 two initiative.

Page 151

1     Q   Behind Perfect Touch?
2     A   Yes.
3     Q   And you're --
4     A   I was the only person who had been there
5  less than a year. Everyone else had been there at least
6  a minimum of nine to 28 years. It took --
7     Q   You're claiming that Mr. Grant spent more
8  time with Ms. Tett and the Perfect Touch program than he
9  spent with you and the plastics program?
10    A   I'm not -- time is part of it.
11 Accessibility was a huge part of it. Accessibility and
12 focus.
13    Q   Time, accessibility and focus?
14    A   And focus on plastics.
15    Q   He was more focused on Perfect Touch than
16 plastics?
17    A   Hm.
18    Q   That's what you're describing in paragraph
19 38 of the complaint -- or 39. I'm sorry.
20    A   No, it was very clear to me that my drivers
21 were volume and profitability.
22    Q   I'm referring to --
23    A   38, right?
24    Q   To 39. "Grant negligently failed to spend
25 any time with the plaintiff to provide coaching." And

Page 152

1  you testified, when I asked you about that, that
2  Mr. Grant -- that your concerns were time, accessibility
3  and focus.
4     A   Failed to spend any time is very general.
5  And I would say that -- I just testified what --
6        MR. HORNER: Excuse me. Just, I
7  think that's an exhibit.
8        THE WITNESS: What's an exhibit.
9        MR. HORNER: A Defendant's Exhibit,
10 this document. So you shouldn't be writing on it.
11       THE WITNESS: Oh, I'm sorry.
12       MR. HORNER: I just caution you not
13 to do that.
14       THE WITNESS: Oh, okay.
15       MR. HAYGOOD: Let the record reflect
16 that Defendant's Exhibit No. 2 was provided to
17 Ms. Owen without any marks on it other than the
18 Court's file stamp. And the stamp --
19       THE WITNESS: Yes, I made a square.
20       MR. HAYGOOD: -- for the deposition
21 exhibit. And any other marginalia or marks there were
22 made during the course of the deposition. Is that --
23       MR. HORNER: Agreed. There's just a
24 few words she put in a box.
25       MR. HAYGOOD: That's fine. I just

Page 153

1  wanted to make certain that was clear on the record.
2  BY THE WITNESS:
3     A   Inadequate time would be a better
4  characterization.
5     Q   You felt that you did not have adequate time
6  with Mr. Grant?
7     A   Not with him. Inadequate time to navigate
8  the things that were going on with five product lines or
9  four product lines that were introduced. A new plant
10 coming on line of which I had absolutely no background
11 with. And over capacity issues. So for the importance
12 of the plastics line and the time afforded this product
13 line, it was inadequate to navigate it to the best of our
14 ability.
15    Q   You felt like Mr. Grant spent inadequate
16 time for you to navigate it to the best of your ability;
17 is that what --
18    A   We spent inadequate time navigating --
19    Q   When you say we, who do you mean?
20    A   I mean both Mr. Grant and myself in
21 collaboration.
22       There were many times that he was unreachable
23 in which I needed -- I had to move forward with
24 information.
25    Q   Mr. Grant --

Page 154

1  A    And I needed to make the best possible
2  decision based on the information that I had.
3  Q    And he was not available at times?
4  A    Was unavailable or -- you know, these things
5  didn't happen overnight.
6  Q    Is there anything else that you're
7  addressing in paragraph 39? Failed to spend any time
8  with plaintiff to provide coaching, other than what we
9  just talked about?
10 A    Just about the plaintiff's continuous
11 attempts at scheduling meetings with him. I had to make
12 appointments. There were other people who could walk in
13 during a meeting and it was not an issue. Many times I
14 would schedule appointments. There was one -- at least
15 six weeks in a row that it was cancelled continuously and
16 that made my job extremely difficult to carry out in the
17 direction of which he wanted.
18 Q    Mr. Grant cancelled meetings. Do you have
19 firsthand knowledge of why he cancelled the meeting?
20 A    Because he had other priorities.
21 Q    Is there anything else in paragraph 39?
22 A    No.
23 Q    Paragraph 40. "Grant negligently failed to
24 provide any feedback to plaintiff other than the annual
25 evaluations." And then you refer to page 5 of TPM.

Page 155

1  A    I think with the way our resources were
2  staffed --
3  Q    I have a question to ask you actually.
4  A    I'm sorry.
5  Q    I'm not inviting you to have just sort of a
6  stream of consciousness here.
7       What, on page 5, are you referring to in your
8  paragraph 40 of the complaint?
9  A    Probably all of it because whenever we would
10 have a schedule or a review which I prepared for, it may
11 have been rescheduled four or five times. And so then it
12 appeared that I may not have been prepared for it because
13 a lot happened in those four to five times. So I think
14 it was just overall phase two, observing and discussing
15 performance along the way. His priorities and our
16 resources did not allow him the time that was necessary
17 to navigate two very important projects which really
18 rolled into, like, eight different important projects.
19 Q    So --
20 A    So really say phase 2. It's just the -- the
21 overall performance management process.
22 Q    But there's no specific language on page 5
23 that you are claiming was breached?
24 A    Overall, the policy was -- No, it's not a
25 specific statement. It's an overall.

Page 156

1  Q    Anything else with regard to paragraph 40?
2  A    Nope.
3       Well, actually --
4  Q    Paragraph 41 --
5  A    Actually, yes.
6  Q    Okay. What else do you claim --
7  A    Well, what I claim --
8  Q    -- was in breach of paragraph -- in breach
9  of TPM?
10 A    There were more than annual evaluations.
11 There were mid-year evaluations. But I asked for those
12 and they were only after I had asked several times again
13 for the same reasons: Other priorities and...
14 Q    So there were mid-year evaluations where you
15 were provided feedback, but you requested them?
16 A    I had to request them, yes.
17 Q    And you had those mid-year evaluations?
18 A    Eventually.
19      And that's what 41 says.
20 Q    You say that you had a favorable mid-year
21 review?
22 A    Mid-year of my first year.
23 Q    That's your first year. So that's year
24 2000?
25 A    Yes.

Page 157

1  Q    And that would have taken place some time in
2  June or July 2000?
3  A    End of July.
4  Q    It says, in breach of TPM, "Grant
5  negligently ignored her and shunned her rather than
6  giving her appropriate pat on the back for good job
7  results," and you cite page 5. I would like you to show
8  me where on page 5 it says anything about ignoring and
9  shunning.
10 A    Actually, I don't -- I think that was more
11 from my experience. Attorney Horner may have put this
12 down with regards to where the policy was. However, pat
13 on the back for good job just resulted in, you know, I
14 would have my -- let's see. Ignored her and shunned
15 her...
16      Right, whenever I would leave the office a
17 major, major crisis would happen. Major. That I could
18 not even participate in those meetings that I'm supposed
19 to be leading.
20 Q    My question was where on page 5 does it say
21 anything about ignoring and shunning?
22 A    I don't know. I guess Attorney Horner may
23 have put that on there that it was covered under there.
24 It's not in the policy to ignore and shun. I think that
25 was part of civility.

Page 158

1  Q   So nothing in TPM about ignoring and
2  shunning?
3  A   That I can specifically put my finger on
4  right now.
5      Oh, wait a minute. Common feedback derailers
6  in appraisals. Making it personal.
7  Q   Where are you looking?
8  A   On page 6.
9  Q   Page 6. Okay.
10 A   Dwelling on past mistakes. Let's see.
11 Making it personal.
12 Q   Where do you see that?
13 A   Under common feedback derailers in
14 appraisals.
15 Q   At the bottom?
16 A   Yeah.
17 Q   This is --
18 A   We did discuss a significant amount of time
19 on personality and character flaws.
20 Q   You did discuss personality and character
21 false?
22 A   Yep.
23     And I was often compared to other employees.
24 Q   Who?
25 A   Oh, one of the product managers up in the

Page 159

1  Canadian office.
2  Q   Who was that?
3  A   You know what, I don't know his name. He
4  was -- I can't remember -- Tom. I can't remember Tom's
5  last name.
6  Q   Was this a comparison favorable?
7  A   Of course not, no.
8  Q   Mr. Tom was performing well?
9  A   I think the point was that you were to -- a
10 common derailer was to compare one person to another and
11 that they should avoid that. And --
12 Q   But when you were compared --
13 A   And it states it in here.
14 Q   When you were compared to Mr. Tom, you don't
15 remember his last name, Mr. Tom, who you don't remember
16 his last name, was performing well is what you're
17 claiming?
18 A   I'm not saying he was performing well. I
19 think what he meant was that he meshed well with the
20 group is what he meant.
21 Q   The comparison was made that Mr. Tom, who
22 you don't remember his last name, was -- you were not as
23 good as him? Is that what you're saying? What --
24 A   That's -- that's what was being told to me,
25 yes.

Page 160

1  Q   Okay.
2  A   And dwelling on past mistakes.
3  Q   And you felt like Mr. Grant dwelled on --
4  A   Here we are. "Comparing the employee with
5  others on the team. It's a common temptation to use
6  other employees to motivate lesser performers." If
7  that's what he was identifying me as. Basically, they
8  are saying these are areas you should stay away from
9  because it can create problems in your interpersonal
10 relationships with these people by bringing these things
11 up. And that's breach of TPM.
12 Q   You are claiming that's a breach of TPM for
13 Mr. Grant to say look at Tom, he's doing a great job, how
14 come you're not doing as good a job as him?
15 A   I think it's a breach when the company
16 provides guidelines to stay away from and they
17 specifically go there.
18 Q   It says -- Anything else with regard to
19 paragraph 36? No, where are we. 42. Anything else with
20 42?
21 A   No.
22 Q   Let's look at 43. "In breach of defendant's
23 manual" -- and I assume by "manual" here, you are
24 referring to TPM?
25 A   Yes.

Page 161

1  Q   "Grant negligently failed to give plaintiff
2  a performance improvement plan. To the contrary, he
3  unjustly rated her and then discharged her. Page ten."
4  A   According to the Total Performance
5  Management program, if you are identified as needs
6  improvement, that a plan is to be put into place. The
7  reason why I feel I was unjustly rated was because from
8  October of '01 until March of '02, I had made dramatic
9  improvements in working with products supply, with
10 manufacturing, with introducing printed cups, with
11 working on the PET project. And not one of the
12 individuals that I worked closely with was even included
13 -- was not even included. It was -- none of their
14 feedback was included in that review.
15 Q   Who specifically are you referring to?
16 A   Bob Davis, Leone Stangle, Liz Stewart, Carol
17 Tompkins, Louie -- what's Louie's last name. Louie
18 DeGeorge. Janice which was in products planning. Mike
19 Hachadourian. There were a lot of people I worked with.
20 A couple of the plant managers that I had been working
21 with.
22 Q   Do you have any firsthand knowledge that
23 those folks' feedback was not supplied to Mr. Grant?
24 A   Yes.
25 Q   What firsthand knowledge do you have?

Page 166

1  Q   Now I asked you for firsthand knowledge. So
2  far what you have told me is some hearsay from Leone, Bob
3  Davis, Liz Stewart, Carol Tompkins and Sharon Tett.
4  A   What makes it hearsay? I'm just -- just
5  explain to me hearsay. I don't understand.
6  Q   You testified that these people told you
7  that their feedback was not included. My question to you
8  is do you have any firsthand knowledge of what feedback
9  Mr. Grant relied on when he prepared your 2001 review?
10 A   From looking at my review, it was his
11 personal assumption and maybe some e-mails that occurred
12 six months to eight months prior.
13 Q   Personal assumptions and six to eight month
14 old e-mail.
15 A   And it could have been later -- earlier than
16 that, too. I'm sure --
17 Q   And earlier than six to eight months?
18 A   It could have been any time during the
19 period.
20 Q   Okay. Any time during the period e-mail.
21     But that's based on your review of the
22 written document that he provided you. You don't have
23 firsthand knowledge of what Mr. Grant did when he wrote
24 that document; do you?
25 A   I wasn't sitting in there with him when he

Page 167

1  wrote it, no.
2  Q   You don't know what documents he was looking
3  at when he wrote it; do you?
4  A   I don't know where he was at that day.
5  Q   Don't know what he looked at?
6  A   Nope.
7  Q   Don't know what he considered, other than
8  what's described in the document.
9  A   All I know is that the TPM document which
10 based a rating, I did not have access to. Which would
11 have showed me how the numbers came to be.
12 Q   But you didn't have firsthand knowledge of
13 what Mr. Grant was looking at?
14     MR. HORNER: Objection. Asked and
15 answered.
16 BY MR. HAYGOOD:
17 Q   I believe you testified earlier -- let's
18 see. Strike that.
19     Is there anything else other than what we
20 talked about that supports your claim for breach of TPM?
21 A   I think we covered 44, the rating and the
22 basis.
23 Q   Yep.
24 A   45. I -- are you questioning me about 45 or
25 46?

Page 168

1  Q   My question is there anything else other
2  than what we've talked about, any other facts that
3  supports your claim for breach of TPM?
4  A   No, I think we covered them all.
5  Q   I just wanted to confirm that we covered
6  everything in your mind that you had to support that
7  claim. Paragraph -- I hate to do this. Paragraph 46
8  says, "Grant breached the resource manual and retaliated
9  against plaintiff for her complaints about him by
10 essentially ignoring and shunning her," etc. Paragraph
11 46 continues. And then you cite pages 61 and page R 85.
12 This is the resource manual. I believe we've already
13 covered 61 and 85, I just want you to confirm with me
14 that there's nothing else other than what we've already
15 discussed about the resource manual?
16 A   I just want to see R 85.
17 Q   By all means.
18 A   Yep.
19 Q   Is there anything else other than what we've
20 already talked about?
21 A   I think we've covered it all.
22 Q   Okay.
23     I would like to know what facts you have to
24 support your claim that Mr. Grant retaliated against you?
25 A   On several occasions -- well actually, in

Page 169

1  2001 in the fall -- not the fall, the late fall probably
2  October or November, I went to Laurie Richman because I
3  had never ever worked with anyone that I did not know
4  after a year's time on a personal level. In a personal,
5  professional, client-employee relationship. And I had
6  felt that because of this hindrance that it was affecting
7  my performance.
8      And what resulted was a Christmas card from
9  Clyde Noel. It wasn't exactly what I was looking for,
10 but whatever.
11 Q   Was the Christmas card a fact that supports
12 your claim that Mr. Grant retaliated against you?
13 A   The feeling of retaliation really came at
14 the end when I was able to sit back and take a look at
15 the things that were going on.
16 Q   Other than the Christmas card from Clyde and
17 the discussion with Ms. Richman in 2001 late fall, do you
18 have any other facts to support your claim that Mr. Grant
19 retaliated against you?
20 A   Yes.
21 Q   Okay. What's next?
22 A   Having worked in food service for several
23 years and servicing the Sysco account in two different
24 capacities at two different companies -- I had been away
25 with Liz Stewart and Carol Tompkins and Sharon Tett on a

Page 198

1  your claim for the --
2  A    My conversations with people with regards to
3  the confusion I was getting attests to the covenants of
4  good faith and fair dealing. One day I was responsible,
5  the next day I was not responsible.
6  Q    Who had that conversation with you?
7  A    That was -- in particular, with Wayne.
8  Q    That was Wayne. When did that conversation
9  take place?
10 A    That had to do with either cup cracking
11 issues that he decided that product supply needs to be
12 responsible for -- however, when it came down to my
13 review, I was ultimately responsible. So I was getting a
14 lot -- And that's in my discussions with Laurie Richman
15 on I'm confused because I'm getting conflicting
16 information. What's the matter?
17 Q    I'm just listening.
18 A    Okay, I was getting conflicting information.
19 Q    Do your discussions with Laurie Richman --
20 you're not claiming those support your breach of the
21 implied covenant of good faith and fair dealing?
22 A    I did go to her at least once or twice on
23 tell me how to deal with this management style.
24 Q    I understand that you went and talked to
25 her. I'm just trying to establish if that's a fact that

Page 199

1  you think supports your claim for the breach of the
2  implied covenant of good faith and fair dealing?
3  A    I think the fact that I went to human
4  resources several times for help and nothing was
5  occurring is a breach.
6  Q    Of the implied covenant of good faith and
7  fair dealing?
8  A    Of -- Yeah.
9  Q    Okay.
10 A    And I think it's also mentioned in the
11 resource manual.
12 Q    But if you go to HR, you are breaching the
13 resource manual?
14 A    No, if you go to other -- if you go to a
15 human resource individual and you are talking about how
16 to better deal with your superior who you should have a
17 normal relationship with, that it shouldn't be
18 retaliated -- that you shouldn't be retaliated against.
19 So retaliation and good fair -- covenants of good faith
20 and fair dealing to me fall hand in hand. I may be
21 wrong. I'm not a lawyer.
22 Q    I understand. I'm just trying to understand
23 the facts that you are asserting support your claim.
24      I understand that you hold the belief that
25 you were fired for an improper purpose. What was that

Page 200

1  improper purpose?
2  A    I was told it was for poor performance.
3  Poor rating, poor performance.
4  Q    So poor performance is the improper purpose.
5  At trial -- that's the improper purpose?
6  A    Yes.
7  Q    At trial, what witnesses would you call to
8  support your belief that you were fired for an improper
9  purpose?
10 A    I hadn't really thought about that. Is
11 that -- since I'm not calling witnesses, is it...
12 Q    What people do you claim have knowledge --
13 A    The people that I worked with directly.
14 Q    Okay.
15 A    That you've already been provided.
16 Q    Who are they?
17 A    You have them in all those documents. I
18 provided you a list of people that I felt were relevant
19 and knowledgeable about my employment.
20 Q    Who can you remember right now?
21 A    All the ones we've already talked about here
22 today.
23 Q    Who are they?
24 A    Okay. Liz Stewart. I just thought this
25 would take more time.

Page 201

1       Liz Stewart, Carol Tompkins --
2  Q    Maybe I can help. How about we do it this
3  way.
4       You have Liz Stewart, Carol Tompkins. You
5  have Rob Davis. Leone Stangle.
6       MR. HORNER: You have to give an
7  audible answer.
8  BY THE WITNESS:
9  A    I'm sorry. Yes.
10 Q    Bob Davis, yes, Leone Stangle?
11 A    Yes.
12 Q    Liz Stewart?
13 A    Jo Shute, which isn't on there. And I
14 actually have an e-mail from Jo Shute.
15 Q    Other than the e-mail from Jo Shute,
16 anything that she specifically has knowledge of?
17 A    Just that there was difficulties,
18 interpersonal difficulties between Wayne and myself.
19 Q    Anything else Jo Shute has knowledge about?
20 A    Not that I know of. Not that I'm aware of.
21 Q    What does Bob Davis have knowledge about?
22 A    I worked very closely with Bob Davis in all
23 the plants that were assigned to me or any plant meetings
24 and any plants that had plastics in it. For Instance
25 Lehigh Valley, the Canadian plant, the Sandusky plant.

Page 202

1  He was also involved as liaison or appointed liaison with
2  the PET project.
3      Q    He's going to testify about Lehigh Valley,
4  Sandusky and the PET project. Anything else that Bob
5  Davis has knowledge about?
6      A    He can testify to where I started with the
7  group and how well we were beginning to work together at
8  the end.
9           So he can attest to my performance.
10     Q    He wasn't responsible for reviewing you,
11 though.
12     A    However, I worked with him more than anybody
13 else and he wasn't included in those reviews.
14     Q    In your experience, is it typical for --
15 Strike that.
16          Anything else Mr. Davis can testify to?
17     A    No. Not that I'm aware of at this moment.
18     Q    Ms. Stangle. Marketing communications
19 person?
20     A    Yes.
21     Q    What can Ms. Stangle testify about?
22     A    She can also testify that we were working
23 very well. That in the beginning there were
24 difficulties, communication difficulties not only with
25 the sales force, but overall. Not -- not with the sales

Page 203

1  force. But difficulty in working with their group and
2  how we had come full circle and were now working better.
3      Q    Ms. Stangle is not in sales is she?
4      A    She's in charge of marketing communications.
5      Q    Anything else from Ms. Stangle?
6      A    I think that's it.
7      Q    Liz Stewart? What can she testify about?
8      A    She can probably testify to the fact that I
9  was a very knowledgeable individual in the food service
10 industry. That I had particularly good insight into
11 product development as Mr. Pesnell over there commented
12 on the simple souffle cup with an attached lid. As well
13 as how she would work with me and her management style
14 was different than Wayne's. She could also attest to --
15 Strike that.
16     Q    Anything else Ms. Stewart can testify to?
17     A    That's pretty much it.
18     Q    Carol Tompkins?
19     A    Carol could probably testify to my
20 day-to-day struggles. And to my bad experience and
21 amount of responsibility versus assistance I was
22 receiving.
23     Q    Anything else?
24     A    That's all.
25     Q    Now you -- Sharon Tett?

Page 204

1      A    Sharon.
2      Q    Is she somebody who can testify about the
3  improper purpose?
4      A    No, I don't think so.
5      Q    Louis DeGeorge, can he testify about
6  improper purposes?
7      A    No, I don't think so. He could testify with
8  respect to not being able to travel in the middle of an
9  important new project.
10     Q    When was that?
11     A    When we were traveling to the plant that was
12 going to be producing our PET cup and the key members of
13 the team had to go but I couldn't go because of budget
14 constraints. And he felt it was extremely important for
15 me to be going. And I couldn't get approval.
16     Q    Anything else Mr. DeGeorge can testify
17 about?
18     A    I think that's it.
19     Q    Janice in planning. Can she testify about
20 improper purpose?
21     A    No. She can testify to confusion.
22     Q    Your confusion she can testify to?
23     A    No, to the department's confusion.
24     Q    Department confusion. Okay.
25          Anything else for Janice in planning?

Page 205

1      A    That's it.
2      Q    Mike?
3      A    Hachadourian.
4      Q    Bingo. Can he testifying about improper
5  purpose?
6      A    He can testify to marketing confusion.
7      Q    But not improper purpose?
8      A    Improper -- he has no knowledge of my
9  employment issues.
10     Q    Only about department confusion?
11     A    Yeah. And procedure --
12     Q    Anything else?
13     A    Yeah, procedure -- proper procedure issues
14 with regards to introducing new products, getting it
15 through the line. He was probably just as knowledgeable
16 about a lot of the quirks in the system as Bob Davis was.
17 And he can testify to the ongoing difficulties of
18 renegade plants.
19     Q    Anything else for Mr. Hachadourian?
20     A    I think that's it.
21     Q    Anybody else who could testify about
22 improper purpose?
23     A    Not that I'm aware of, no.
24     Q    What documents would you use to support your
25 claim that the company discharged you with an improper

Page 210

1  employees, that they were negligent in providing
2  appropriate supervisor.
3      Q   They were negligent in providing an
4  appropriate supervisor?
5      A   A supervisor focused on -- that can
6  provide -- I think that they were negligent in providing
7  the resources to ensure that Wayne was not negligent.
8      Q   Any other facts to support your claim that
9  Georgia-Pacific negligently hired Mr. Grant?
10     A   Do I have any facts?
11     Q   Uh-huh.
12     A   I have hearsay. With regards to individuals
13  who -- and hearsay from company to company that I've
14  worked for that have both a retail and a food service
15  side.
16     Q   You have some hearsay, but do you have any
17  firsthand knowledge to support your claim that the
18  company negligently hired Mr. Grant?
19     A   Given the outcome of this relationship and
20  position, that they negligently continued to let it
21  fester. Which is covered in 91.
22     Q   You weren't present for Mr. Grant's hiring?
23     A   No, I wasn't. It was, like, 9 or 13 years
24  ago.
25     Q   You don't even know when he was hired?

Page 211

1      A   No, I don't.
2      Q   And you don't know how he was hired?
3      A   No.
4      Q   And you don't know what the company did with
5  regard to hiring him?
6      A   No, I have no firsthand knowledge, no.
7      Q   Any other firsthand knowledge to support
8  your claim in count 5?
9      A   That there was some concern when Wayne came
10  back after leaving for two years.
11     Q   When was that?
12     A   He came back in May of -- before I came to
13  work for them. May of '99. And --
14     Q   You weren't there in May of '99?
15     A   No, I wasn't.
16     Q   So you don't have any firsthand knowledge of
17  any --
18     A   Well, he did keep asking me why I would want
19  to work with him.
20     Q   He asked you why you would want to work with
21  him?
22     A   Several times.
23         And then after the exodus of four people from
24  the department in --
25     Q   When was that?

Page 212

1      A   Well I started in January, he was hired in
2  May and about three or four people already had plans to
3  leave the department.
4      Q   You have firsthand knowledge of this? How?
5      A   That they were -- because they were still
6  there in the department with me for at least four -- at
7  least four months. Maybe -- at least the first quarter.
8  So I did get to know some of them. Went --
9      Q   Who are they?
10     A   Went to their going away party. Actually,
11  the one that used to handle the McDonald's cups, I can't
12  remember his name. But I couldn't understand why Wayne
13  came up to me and said oh, you guys are probably talking
14  about me. Which I thought was totally inappropriate.
15  Why would I talk about him.
16         And then the other --
17     Q   Who else? Guy running the McDonald's cups.
18     A   Yeah, I can't remember his name. He was
19  only there for a couple months when I was there. And the
20  gentleman who took over customer service. Head of
21  customer -- Pat.
22     Q   Who else?
23     A   And there was a gentleman before me that
24  left. The position I was in. I don't know his name. I
25  think his name was Peter.

Page 213

1      Q   You don't have any firsthand knowledge of
2  anything that happened with Peter; do you?
3      A   Firsthand knowledge, no. Okay.
4      Q   So you identified four -- you said three to
5  four people that had plans to leave. McDonald's cup
6  person, a person you can't remember their name and head
7  of customer service person, Pat. Are those --
8      A   Pat.
9      Q   Is there --
10     A   Pat Zimmer.
11     Q   Okay.
12     A   I'm trying to remember the cup guy's name.
13  So how many is that?
14     Q   That's three. McDonald's cup, cup guy, head
15  of customer service?
16     A   I may have also been including Brian, who
17  was the original person who interviewed me because he was
18  laid off when Wayne -- after Wayne arrived. So I did
19  include him.
20     Q   He was laid off. Was he there when you
21  arrived?
22     A   He was the person I initially interviewed
23  with.
24     Q   Initially interviewed with. You don't have
25  firsthand knowledge about the circumstances of his being

Page 246

1  this complaint three days after the review, would have
2  interpreted "I'm not going to answer your question" as an
3  expression of your not following specific coaching that
4  he had given you?
5    A    You know what, I don't know what was in my
6  head that day and what was going on. That may have been
7  the fourth time I had a scheduled meeting with Wayne and
8  I was not getting any feedback. So I can't tell you my
9  state of mind at the time of that document. I can tell
10 you I, obviously, said to him "I'm not going to answer
11 your question, so contact your customer service
12 representative." I didn't say it in large caps.
13   Q    Are you saying that you weren't getting any
14 feedback from Mr. Grant three days after your mid-year
15 review?
16   A    I'm saying that when there were significant
17 product supply issues and we were getting 50 to 60
18 e-mails with regards to product supply, product quality,
19 that it was frustrating to not know which way to turn.
20 Should I -- which fire to put out. And my frustration
21 level continued to escalate.
22   Q    I understand that your frustration level
23 continued to escalate. I thought I understood you to
24 testify you thought with you weren't getting any feedback
25 from Mr. Grant on July 31, 2000 three days after your

Page 247

1  review. And I just wanted to know if, in fact, that's
2  what you were testifying about? Is that -- did I
3  understand your testimony correctly?
4    A    That is correct.
5    Q    Okay.
6         I would like to show you --
7    A    Did I have a document back to Wayne on that?
8    Q    -- what's been marked as Defendant's Exhibit
9  17.
10        (Defendant's Exhibit 17 was marked
11        for identification: E-mail documents.)
12 BY THE WITNESS:
13   A    You know, these were all of 2000. And there
14 were a lot of good things that happened after 2000,
15 during 2001 and 2002.
16   Q    I just want to ask you about Defendant's
17 Exhibit 17.
18   A    Good. Okay.
19   Q    This is an e-mail exchange, the last date of
20 which is July 31, 2000 at 6:02 p.m. And it's from Tom
21 Hasley to Wayne Grant. Is that correct?
22   A    It certainly is.
23   Q    And the e-mail just prior to that is dated
24 Monday, July 31, 2000 at 11:39 a.m. from you to Tom
25 Hasley; is that correct?

Page 248

1    A    That is correct.
2    Q    And you say, "Your e-mails are wasting our
3  time, do not bother replying. Do I have that right?"
4    A    Donna to Tom. Let's see what he said. I'm
5  going to start from the beginning because it goes back.
6    Q    Okay. You can look at all that you like.
7  But I'm only asking you about this business on July 31,
8  2000 at 11:39 a.m. Feel free to review the document?
9    A    But I need to know what it refers to.
10   Q    Fine. You are welcome to look at it. I
11 just asked a very specific question.
12   A    And I -- I hear you.
13        Well, the e-mail --
14   Q    I have a question to ask you, actually when
15 you finished reviewing it?
16   A    I'm done reviewing it.
17   Q    On July 31, 2000 you responded to
18 Mr. Hasley, "Your e-mails are wasting our time, do not
19 bother replying"; is that correct?
20   A    That's what this says. I don't recall
21 writing the e-mail.
22   Q    Are you suggesting --
23   A    But that's what it says.
24   Q    Do you have any facts to support an
25 allegation that this is not your e-mail?

Page 249

1    A    I have no facts to support that it is or is
2  not my e-mail.
3    Q    It appears that Mr. Hasley forwarded this
4  e-mail to Mr. Grant on July 31, 2000 at 6:02 --
5    A    Yes, it does look like that, yes.
6    Q    And the text of that is FYI; is that
7  correct?
8    A    Yes.
9    Q    This is also three days after your mid-year
10 review? Is that correct?
11   A    Yes, it is.
12   Q    Okay. I would like to show you -- one other
13 question. As you sit here today, do you think that a
14 response to an e-mail, "Your e-mails are wasting our
15 time, do not bother replying," is an appropriate
16 response?
17   A    That entire response didn't seem appropriate
18 to the question before that. So I don't know if that's
19 been doctored just like a photo. I have no understanding
20 if it were in my -- if you told me it came from my
21 mailbox, I would say yes. But I don't know if that came
22 from my mailbox. It obviously came from Wayne's mailbox.
23 So a lot of people have touched -- it's just like a
24 photograph. I'm not saying that I did or didn't do that,
25 because I don't remember.