## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

DONNA OWEN,                              :
                                        :
     Plaintiff,              :
                                        :
v.                                      :    No. 3:03CV378(DJS)
                                        :
GEORGIA-PACIFIC CORPORATION,            :
                                        :
     Defendant.              :

### MEMORANDUM OF DECISION

Plaintiff, Donna Owen ("Owen"), brings the instant action against her former employer, defendant Georgia-Pacific Corporation ("Georgia-Pacific"), alleging six causes of action arising out of the course of her employment with Georgia-Pacific: breach of oral contract (Count One), two counts of breach of written contract (Counts Two and Three), breach of the implied covenant of good faith and fair dealing (Count Four), negligence (Count Five), and promissory estoppel (Count Six). Georgia-Pacific's motion for summary judgment (dkt. # 29) pursuant to Rule 56(c) of the Federal Rules of Civil Procedure is now pending before the court. For the reasons that follow, Georgia-Pacific's motion is **GRANTED.**

### I. FACTS

In January of 2000, Owen was hired as a product manager for the plastics category at Fort James Corporation's ("Fort James") Dixie facility in Norwalk, Connecticut. Later that year, Fort James was acquired by Georgia-Pacific. As product manager, Owen

was the leader of the plastics category and had the principal duty of supporting the sales force.  Sales managers were Owen's key internal customers and depended on her knowledge of pricing and production.  Owen and the rest of the plastics category were supervised by the Director of Marketing for Dixie Foodservices, Wayne Grant ("Grant").

In early March of 2002, Georgia-Pacific held a meeting announcing to the Norwalk employees that the Dixie headquarters was relocating to Atlanta, Georgia.  At least thirty people were present at the meeting where the Dixie President, William Schultz, discussed both relocation and the Georgia-Pacific Corporation-Fort James Transition Severance Pay Plan For Salaried Employees ("Severance Plan").  Employees were told, "you have the same job, it's just in Atlanta," and that they should make a trip to Atlanta to evaluate schools, housing opportunities and other conditions.  Sometime after this meeting, Owen met with Georgia-Pacific Vice President and General Manager for the Dixie Foodservice business, Mike Dunn ("Dunn"), who assured her that, even in the event she was not offered relocation to Atlanta, it would still be a "win-win" situation given the Severance Plan.  (See Dkt. # 31, Ex. A (Owen Dep.) at 31:1-7).  Owen understood this to mean that if she was not offered an opportunity to relocate to Atlanta, she could continue her employment in Norwalk until the end of 2002 and would receive benefits pursuant to the

terms of the Severance Plan.  Receipt of benefits pursuant to the Severance Plan was contingent upon maintaining employment at Georgia-Pacific until the "Termination Date" stated in the Severance Plan, which was December 31, 2002.

Shortly after the March 2002 meeting, Owen visited Atlanta, but ultimately never went on to work there.  On April 15, 2002, Owen was terminated from her position at Georgia-Pacific.  Dunn terminated Owen for her allegedly poor performance, an issue which Grant claimed to have dealt with since shortly after Owen was hired. (See Dkt. # 31, Ex. E at 1:4-13; at 2:1-10). Throughout Owen's work in Norwalk, Grant praised her for assertiveness but also characterized her style as aggressive. Although, according to Grant, he wanted his employees to be assertive, Grant felt that Owen was too aggressive, and that it contributed to the tension between her and the sales employees. For example, according to Grant, a source of tension was that Owen's goal was to increase the volume of sales, while the marketing team's goal was to increase the profits of sales.

On July 28, 2000, Grant's mid-year evaluation of Owen reflected his concern about her aggressive style.  This concern was reiterated in Grant's 2000 year end evaluation where he expressed concern about Owen's poor behavior.  A source of Grant's concern arose from correspondences he had with various Georgia-Pacific employees regarding Owen.  From the period of

time between the 2000 mid-year evaluation and the 2001 year end evaluation, Grant received complaints from at least six different employees regarding Owen's poor communication, attitude, etiquette, and overall performance. (See Dkt. # 31, Ex. B, at 2-4; see also id., Ex. E, ¶ 5 (Dunn's affidavit)).  Many of the complaints were made by email, and some provided forwarded messages evidencing Owen's behavior.  Grant's 2001 year end evaluation of Owen consolidated the three areas of Owen's performance Grant deemed problematic: analytical, leadership, and people management. (See Dkt. # 31, Ex. A, Ex. 22).  In addition, Grant rounded down Owen's evaluation score from 2.6 to 2.0, a technique that had not been practiced on previous evaluations. (See Dkt. #31, Ex. A, Ex. 15, Ex. 20, & Ex. 22).

In March of 2002 Dunn was named Georgia-Pacific's Vice - President and General Manager for the Dixie Foodservice business. During a meeting with Dunn, Grant identified Owen as a poor performer.  Shortly thereafter, according to Dunn, he confirmed with other sales managers that Owen, in fact, did display such abrasive and negative behavior.  Dunn concluded that Owen had become a detriment to the Dixie Foodservice organization.  (See Dkt. #31, Ex. E at 2: 1-7).  As a result of the negative feedback and Grant's recommendation, Owen was terminated for poor performance.

By contrast, Owen argues that her performance was above average throughout her time of employment at Georgia-Pacific. Her profitability for 2001 was 128%, which was the amount she was on "plan" to profit.  This trend continued in 2002 when she again succeeded in exceeding the profitability plan.  Owen argues that, with the possible exception of one other employee in the department, her individual sales were the most profitable. Further, Owen notes that she complained to human resources that Grant was treating her inconsistently and unfairly.  For these reasons, Owen claims that she did not perform poorly, but rather that Grant and Georgia-Pacific breached their obligations to manage her in accord with the principles set forth in materials promulgated by Georgia-Pacific.

On or around January 29, 2002, Owen attended a training course entitled "Civil Treatment for Managers" ("the course"). The course was authored by Steven M. Paskoff, Esq., the President of Employment Learning Innovations, Inc.  The course emphasized professional management skills and the avoidance of lawsuits.  At the program, all attendees received a Civil Treatment for Managers Program ("CTM document") that included some of Georgia-Pacific's policies of employment.  Owen received a copy of the CTM document during her Civil Treatment training.  Owen believed it to be a contract, while Georgia-Pacific believed it to be a "guideline" for managers.

Georgia-Pacific also communicated policies to Norwalk employees through a computer "intranet" system that contained a Total Performance Management web-based tool ("TPM tool"). Managers used the TPM tool for a variety of purposes, including, but not limited to, employee performance evaluation.  The TPM tool was located in the section of the intranet entitled "My HR," along with other Georgia-Pacific policies, including employment termination,[1] which states the following:

> [i]t is the policy of Georgia-Pacific Corporation that the employment of any salaried employee or non-bargaining unit hourly employee can be terminated, with or without cause, at any time, at the option of the employee or at the option of the Company.  No employee or representative of Georgia-Pacific Corporation or any of its subsidiaries, other than the chairman of the board of Georgia-Pacific Corporation or his appointed designee has any authority to enter into any agreement guaranteeing or extending the employment of any employee for any specific period of time, or to make any agreement contrary to the foregoing.

(Dkt # 31, Ex. A, Ex. 11 at 1).  While it is unclear when the TPM tool was actually first implemented, Grant, as Owen's manager, was instructed to use the tool for his 2002 calender year evaluations.[2]  Since Owen was terminated in April 2002, Georgia-

---

[1] Despite the availability of the "My HR" section, which contained the employment termination policy, Owen claims not to have read the section.

[2] Owen printed an overview of the TPM program on March 15, 2002.

-6-

Pacific did not issue her a 2002 year end evaluation, and she was never evaluated according to the TPM tool's guidelines.

Georgia-Pacific's Severance Plan was established, amended, and restated the on December 31, 2001.  The purpose of the Severance Plan was to provide benefits for employees affected by the combination of Georgia-Pacific and Fort James.  Specifically, the Severance Plan provided that Georgia-Pacific intended the plan to "constitute a 'welfare plan' under [the Employee Retirement Income Security Act of 1974]. . . ."  (Dkt. # 31, Ex. A, Ex. 4 at 16).  The Severance Plan provides that an "Eligible Employee" whose employment is terminated involuntarily will be entitled to severance benefits if "[t]he Eligible Employee remains an Eligible Employee through his/her Termination Date." (Id., at 2-3).  "Voluntary termination or termination for Cause before the Termination Date will result in the forfeiture of any right to severance benefits under this Plan."  (Id., at 6). Termination "for Cause" includes "poor performance."  (Id., at 3).  The "Termination Date" is the date when the Employer specifies to the Eligible Employee that he has been terminated for purposes of the Plan.  (Id., at 6).  Under the Severance Plan, had Owen been eligible for benefits, she would have received twenty-four weeks of severance pay and seventeen weeks of supplemental severance pay.

## III. DISCUSSION

Georgia-Pacific moves for summary judgment with respect to all counts of Owen's complaint on the basis that there are no genuine issues as to any material facts such that Georgia-Pacific is entitled to judgment as a matter of law.  Owen claims that Grant's rounded scoring on evaluations and failure to use the TPM tool or the CTM document in terminating her resulted in a subjective, unfair, and improper termination procedure.  (See Dkt. # 38, Ex. B at 59:22-25, 63:14-25, & 65:1-3).  Owen brings the following causes of action against Georgia-Pacific: breach of oral contract (Count One), two counts of breach of written contract (Counts Two and Three), breach of the implied covenant of good faith and fair dealing (Count Four), negligence (Count Five), and promissory estoppel (Count Six).

### A. STANDARD

A motion for summary judgment may be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).

Summary judgment is appropriate if, after discovery, the nonmoving party "has failed to make a sufficient showing on an essential element of [its] case with respect to which [it] has

-8-

the burden of proof." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). "The burden is on the moving party 'to demonstrate the absence of any material factual issue genuinely in dispute.'" American Int'l Group, Inc. v. London Am. Int'l Corp., 664 F.2d 348, 351 (2d Cir. 1981) (quoting Heyman v. Commerce & Indus. Ins. Co., 524 F.2d 1317, 1319-20 (2d Cir. 1975).

A dispute concerning a material fact is genuine "'if evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" Aldrich v. Randolph Cent. Sch. Dist., 963 F.2d 520, 523 (2d Cir. 1992) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). The court must view all inferences and ambiguities in a light most favorable to the nonmoving party. See Bryant v. Maffucci, 923 F.2d 979, 982 (2d Cir. 1991). "Only when reasonable minds could not differ as to the import of the evidence is summary judgment proper." Id.

B. BREACH OF ORAL CONTRACT AND PROMISSORY ESTOPPEL

Georgia-Pacific argues that summary judgment is appropriate on Owen's breach of oral contract (Count One) and promissory estoppel (Count Six) claims because these claims are related to an employee welfare plan and are therefore preempted by the Employment Retirement Income Security Act of 1974 ("ERISA"). See 29 U.S.C. § 1144(a) (2005). Owen contends that these two claims are based on oral assurances of continued employment, and that these assurances are not related to an ERISA plan.

-9-

ERISA preempts "any and all state laws insofar as they may now or hereafter relate to any employee benefit plan. . . ."  29 U.S.C. § 1144(a)(2005).  In drafting the statutory scheme, Congress deliberately included a broad preemption clause to "establish pension plan regulation as exclusively a federal concern."  Smith v. Dunham-Bush, Inc., 959 F.2d 6, 8 (2d Cir. 1992); see Pilot Life Ins. Co. v. Dedeaux, 481 U.S. 41, 46 (1987) (quoting Alessi v. Raybestos-Manhattan, Inc., 451 U.S. 504, 523 (1981)).  The breadth of ERISA, however, may be restrained in specific matters of state importance.  See California Div. of Labor Standards Enforcement v. Dillingham Constr., N.A., Inc., 519 U.S. 316, 325 (1997); Hillsborough County v. Automated Med. Labs., Inc., 471 U.S. 707, 715 (1985).  For example, in Hillsborough County, the Supreme Court held that the traditional police powers of the state, such as health and safety, may not be preempted by ERISA.  Id. at 719; see Rice v. Santa Fe Elevator Corp., 331. U.S. 218, 230 n.4 (1985).  Additionally, laws regulating insurance, banking, securities, and generally applicable criminal laws are also exempted from ERISA's reach. See 29 U.S.C. §§ 1144(b)(4)(2005) & 1144(h)(2)(A)(2005); see also Smith, 959 F.2d at 7.

Under ERISA, a state law "relates to" an employee benefit plan so long as there is "a connection with or reference to such plan."  Ingersoll-Rand Co. v. McClendon, 498 U.S. 133, 139

-10-

(1990); see also Smith, 959 F.2d at 8 (quoting Shaw v. Delta Air
Lines, Inc., 463 U.S. 85, 96-97, 103 (1983)).  As a result, a
generally applicable state law that only indirectly affects a
plan may still "relate to" such plan and therefore fall within
ERISA's preemption clause.  Smith, 959 F.2d at 8.  In Smith, the
plaintiff brought breach of contract and negligent
misrepresentation claims against his employer based on an oral
promise for pension-related benefits.  Id. at 7.  The court found
that, even though plaintiff's complaint did not mention a plan,
one did exist, and that a state law cause of action based upon an
oral promise was an attempt to secure an additional benefit
thereunder.  Id.  The court of appeals held that to permit such a
cause of action would not only provide employees with two
remedies for the same cause of action, but also would infringe
upon Congress' intent in devising ERISA; the court reasoned that
employers would be more likely to "reduce benefits or to refrain
altogether from adopting such plans for fear of being subject to
frequent and inconsistent state law challenges by disgruntled
participants."  Id. at 8-9 (quoting Fort Halifax Packing Co. v.
Coyne, 482 U.S. 1, 10-11 (1987)).  Therefore, the court held that
plaintiff's cause of action related both to the benefits claimed
and to the plan.  Id. at 12-13

     In the instant case, Owen's cause of action relates to the
Severance Plan and is therefore preempted.  Owen brings her

breach of oral contract and promissory estoppel claims against
Georgia-Pacific based on the oral assurances she received
regarding relocation and the Severance Plan.  These assurances
were given by Schultz and Dunn during the meeting regarding
relocation in March of 2002.  Owen alleges she was induced into
believing that, in the future, she would either "have the same
job, [just] in Atlanta," or, that she would remain in Norwalk and
receive benefits from the Severance Plan.  Owen admitted in her
deposition that in the event she was not chosen, or did not
choose to relocate, her eligibility for the Severance Plan
benefits depended on maintaining employment through the
"Termination Date" of December 31, 2002.[3]  (See Dkt. # 31, Ex. A
(Owen Dep.) at 26:1-7).  Georgia-Pacific's representations were
confined to the contours of the Severance Plan, and did not
address her job security irrespective of relocation.

Owen's breach of oral contract and promissory estoppel
claims both "relate to" the Severance Plan.  Both claims arise
out of the relocation meeting where it was specifically mentioned
that the Severance Plan would provide the sole benefit for those
employees not moving to Atlanta.  Further, the Severance Plan is

---

[3] The Severance Plan contains the following provision: "Is
this plan intended to be governed by the provisions of the
Employee Retirement Income Security Act of 1974, as amended
("ERISA")?  Yes. G-P intends that this Plan constitute a "welfare
plan" under ERISA, and any ambiguities in this Plan will be
construed to effect that intent." (Dkt. # 31, Ex. A, Ex. 4 at
16).

an ongoing welfare plan expressly governed by ERISA.  Therefore, any claim that a Georgia-Pacific employee might have regarding the Severance Plan is determinable only under the ERISA scheme. To allow an employee like Owen to bring a state law claim relying on a matter governed by ERISA would effectively permit her to secure an additional benefit, which would be duplicative and would diminish the Congressional objective of preempting an area of state law.  See Smith, 959 F.2d at 8 (citing Metropolitan Life Ins. Co. v. Taylor, 481 U.S. 58, 63-64 (1987); see also Franchise Tax Bd. v. Const. Laborers Vacation Trust, 463 U.S. 1, 24 (1983). Therefore, Georgia-Pacific is entitled to summary judgment with respect to Owen's breach of oral contract and promissory estoppel claims set forth in Counts One and Six of the complaint.

### C. BREACH OF IMPLIED CONTRACT

Owen claims that provisions of certain documents promulgated by Georgia-Pacific are terms of an implied contract between her and Georgia-Pacific.[4]

### 1. CTM Document

Owen claims that Georgia-Pacific did not apply the criteria contained within the CTM document when terminating her employment

---

[4] Owen also claims that an implied contract was created when oral commitments of job security were allegedly made at the company relocation meeting in March 2002. Because the Court has already held that Owen's claims predicated upon the oral assurances stated at the relocation meeting are preempted by ERISA, only the CTM document and TPM tool will be considered in evaluating Owen's breach of implied contract claims.

-13-

and therefore breached an implied contract that arose between her and Georgia-Pacific.   In general, permanent employment contracts or employment contracts for an indefinite period are terminable at will at the employers discretion.  See Davis v. Liberty Mut. Ins. Co., 218 F. Supp. 2d 256, 260 (2002) (citing Sheets v. Teddy's Frosted Foods, Inc., 179 Conn. 471, 474 (1980)); see also Torosyan v. Boehringer Ingelheim Pharm., 234 Conn. 1, 14 (1995); D'Ulisse-Cupo v. Bd. of Dirs. of Notre Dame High Sch., 202 Conn. 206, 211 n.1 (1987).  Under certain circumstances, however, representations in an employer's personnel manual or handbook "may give rise to an express or implied contract between employer and employee." Finley v. Aetna Life & Cas. Co., 202 Conn. 190, 198 (1987), overruled on other grounds by Curry v. Burns, 225 Conn. 787, 789 (1993); see Magnan v. Anaconda Indus., Inc., 193 Conn. 558, 564 (1984).  An express contract is a contract that contains actual words which set forth the terms and conditions of the agreement.  See Fleming v. Sedgwick, No. CV 94 054 14 29, 1995 WL 500545, at *1 (Conn. Super. Ct. Aug.  11, 1995); see also Brigenti v. New Britain Shirt Corp., 167 Conn. 403, 406 (1974). An implied contract arises when a plaintiff demonstrates that there was actual agreement between the parties such that a contractual promise was forged. See Coehlo v. Posi-Seal Int'l, Inc., 208 Conn. 106, 112 (1988); Christensen v. BIC Corp., 18 Conn. App. 451, 458 (1991) (finding that a "contractual promise

-14-

cannot be created by plucking phrases out of context; there must be a meeting of the minds between the two parties").

Typically, "in the absence of definitive contract language, the question of whether the parties intended the manual to constitute part of the contract is a question of fact to be determined by the trier of fact." Carbone v. Atlantic Richfield Co., 204 Conn. 460, 471-72 (1987) (citations omitted); see Finley, 202 Conn. at 199. The issue of whether a company document is the basis of an enforceable contract, however, does not automatically create a question of fact for the jury to decide. See Foster v. Massachusetts Mut. Life Ins. Co., No. Civ.3:02CV1433(PCD), 2004 WL 950827, at *2 (D. Conn. Apr. 14, 2004); Manning v. Cigna Corp., 807 F. Supp. 889, 893 (D. Conn. 1991) (citing Owens v. American Nat. Red Cross, 673 F. Supp. 1156, 1165 (D. Conn. 1987); Finley, 202 Conn. at 199 n.5). On a motion for summary judgment, whether a manual is an enforceable contract is determined by examining the contract in the light most favorable to the plaintiff, and this is a question of law for the court. See id.

The CTM document is not enforceable as a contract because it eschews promissory language and includes a disclaimer of intent to form a contract. Finley, 202 Conn. at 199 n.5. The dispositive issue is not, as Owen claims, what the parties intended to encompass as contractual commitments, but rather

-15-

whether the CTM document itself actually sets forth contractual commitments.  See <u>Levine v. Massey</u>, 232 Conn. 272, 277-278 (1995); <u>Finley</u>, 202 Conn. at 199 (finding that a question of parties contractual intent is an inference of fact for the jury to find).  Owen has not pointed to any language within the CTM document that may reasonably be relied upon as a basis of contractual obligation.  In <u>Sivell v. Conwed Corp.</u>, this court found that a distributed personnel manual failed to form a contractual obligation because it only contained guidelines, and not mandatory directives.  <u>Sivell v. Conwed Corp.</u>, 666. F. Supp. 23, 27 (D. Conn. 1987).  This holding is comparable to the court's findings in <u>Manning</u> that a manual lacking promissory language cannot reasonably be construed as an offer, agreement, or meeting of the minds such that "actual contract[ual] commitment" could be found.  <u>Manning</u>, 807 F. Supp. at 895 (internal quotation marks omitted).  Here, the court is presented with the same situation.  The CTM document does not set forth "mandatory directives" that would make it contractually binding upon the parties.  <u>Id.</u>  The substance of the CTM document covers Georgia-Pacific's adherence to educating its managers on how to protect themselves from actions which could lead to litigation.[5]

---

[5] This precautionary message, as set forth throughout CTM's chapters, is "through several proactive steps, [to] increase [one's] effectiveness as a manager and decrease the legal risks to you and your organization." (Dkt. # 31, Ex. A, Ex. 9 at 11).

These provisions are guidelines and do not meet the standard for a manifestation of actual commitment.  Thus, when a reasonable trier of fact examining the CTM document only could arrive at the conclusion that if there is no contractual promise, summary judgment must be granted.

Georgia-Pacific is further protected because the CTM document contains an explicit disclaimer on its inside cover:

> [t]he information contained in this manual deals with general suggestions for handling employment related problems; however, it does not consist or legal advice or services. As particular problems develop, employers and their representatives should contact counsel for advice as indicated throughout the Civil Treatment for Managers program.

(Dkt. # 31, Ex. A, Ex. 9). Employers can protect themselves from contractual liability of a personnel manual if promissory language is avoided or appropriate disclaimers are inserted.  See Gaudio v. Griffin Health Services Corp., 249 Conn. 523, 535 (1998); Finley, 202 Conn. at 199 n.5.  The passage qualifies as a disclaimer because it is devoid of any intention to bind the parties contractually, is placed on the inside cover of the document, is the only passage on the page, and is preceded by large bold font entitled "Important Notice." See, e.g., Schermerhorn v. Mobil Chem. Co., No. 3:99 CV 941(GLG), 2001 WL 50534, at *6 (D. Conn. Jan. 9, 2001) (holding that proper disclaimers in employee handbooks and manuals like the one in the case at bar have the effect of solidifying an employees at-will

status); Cardona v. Aetna Life & Cas., No. 3:96CV1009, 1998 WL 246634, at *4-5 (D. Conn. May 8, 1998)(same); Smith v. Shoreline Care Ltd., No. 360206, 1996 WL 365015, at *12 (Conn. Super. Ct. May 17, 1996)(same).  Based on the contents of the CTM document, the court finds that the CTM document does not, as a matter of law, qualify as an implied contract, and thus, cannot be breached.

### 2. TPM Tool

Owen argues that Georgia-Pacific also breached promises of job security allegedly set forth in the TPM tool.  According to Owen, Georgia-Pacific's unwillingness to adhere to the policies and procedures set forth within the TPM tool resulted in a breach of implied contract.[6]  (See Compl. at 71-73).  Georgia-Pacific counters that the TPM tool, found in Georgia-Pacific's intranet, fails to give rise to any manifestation of contractual intent. Similar to Owen's CTM document claim, the success of the instant claim depends upon proving that Georgia-Pacific "agreed, either by words or action or conduct, to undertake [some] form of actual contract commitment" to Owen under which her employment could only be terminated for just cause.  Coehlo, 208 Conn. at 112.

---

[6] Owen predicates this theory upon Georgia-Pacific's failure to manage Owen in day-to-day operations, to advise Owen, to spend time with Owen, to provide feedback to Owen, to notice  Owen, to give Owen an improvement plan, and to provide a basis for a rating of 2.6 in 2001. (See Compl., ¶¶ 37-44).

-18-

The TPM tool, similar to the CTM document, is not enforceable as an implied contract because its purpose is informative, not directive, and because it contains a valid disclaimer. <u>See</u> <u>Finley</u>, 202 Conn. at 199 n.5; <u>Sivell</u>, F. Supp. at 27. The TPM tool is void of contractually binding language and instead describes the policies and procedures managers should use in communicating and evaluating their employees. For example, Owen alleges that Georgia-Pacific terminated her without obtaining the necessary documentation required to prove "unsatisfactory" work. The TPM tool's description for "unsatisfactory" work explains that such work "is reflective of poor performance, where few results are achieved and major deficiencies exist . . . [which] negatively impac[t] the business. . . [Performance] duties requir[e] constant monitoring and guidance . . . [a] progressive discipline process, [and] a specific improvement plan." (Dkt. # 31, Ex. A, Ex. 10 at 12). This language can not be considered promissory because it lacks any indication that Georgia-Pacific intended to bind itself to act a certain way. <u>See</u> <u>Foster</u>, 2004 WL 950827, at *19 (citing <u>Christensen</u>, 18 Conn. App. at 458). To strictly require a manager to find each step of "unsatisfactory" before terminating an employee would effectively require a manager to tape or save every conversation, written or oral, with each employee in anticipation that some day, if discharged, he or she might sue.

Such a requirement would not only be unreasonably cumbersome, but also is not founded in the language of the TPM tool.  The only intention that can be derived from the TPM tool is to inform managers what policies and procedures to use when evaluating employees.  Thus, the language of the TPM tool does not permit disagreement necessitating a decision by the trier of fact.  <u>See</u> <u>Foster</u>, 2004 WL 950827, at *2; <u>Manning</u>, F. Supp. at 893(citing <u>Owens</u>, F. Supp. at 1165; <u>Finley</u>, 202 Conn. at 199 n.5).

Just as important as the TPM tool's lack of promissory language is Georgia-Pacific's policy regarding the termination of employment, located in the same intranet section as the TPM tool. The policy states that "any salaried employee . . . can be terminated, with or without cause, at any time, at the option of the employee or at the option of the company." (Dkt. #31 Ex. A, Ex. 11 at 1).  Although not labeled "disclaimer," this section of Georgia-Pacific's intranet is an explicit disclaimer.  <u>See</u> <u>Davis</u>, F. Supp. 2d at 261 (citing <u>Cardona</u>, 1998 WL 246634 at *5); <u>see</u> <u>also</u> <u>Manning</u>, F. Supp. at 893; <u>Finley</u>, 202 Conn. at 199 n.5.  The language is clear, obvious, and unequivocal as to be readily observable to any employee familiar with the "My HR" section of Georgia-Pacific's intranet.  <u>Davis</u>, F. Supp. 2d at 261 (citing <u>Cardona</u>, 1998 WL 246634 at *5).  Thus, Georgia-Pacific has sufficiently protected itself from contractual liability. Accordingly, Georgia-Pacific's motion for summary judgment with

respect to the claim in Count Three of Owen's complaint is
granted.

### D. BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

Owen also alleges in Count Four of her complaint that
"Georgia-Pacific was obligated under the implied employment
contracts with Owen to follow its [CTM document] or TPM or to
inform of its intention not to do so."  (Compl., ¶ 82).  In
support of her assertion that the CTM document or TPM tool
created an implied contract with Georgia-Pacific, Owen alleges
that "Georgia-Pacific was obligated to inform Owen of any
performance or conduct problem, including any conduct which would
cause Georgia-Pacific to discharge Owen" and that failure to do
so was a breach of the implied covenant of good faith and fair
dealing. (Compl., ¶ 83).

A claim for breach of the implied covenant of good faith and
fair dealing requires three elements: (1) two parties must engage
in a contract which the plaintiff reasonably expects to benefit;
(2) the benefit is in some way injured by the other party's
actions; and (3) these injurious actions were the product of the
defendant's bad faith.  See Franco v. Yale Univ., 238 F. Supp. 2d
449, 455 (D. Conn. 2002); Fairfield Fin. Mortgage Group, Inc. v.
Salzar, No. CV000339752S, 2002 WL 1009809, at *3 (Conn. Super.
Ct. Apr. 23, 2002).  Owen's claim fails for two reasons.  First,
neither the CTM document nor the TPM tool qualify as implied

contracts.  Second, there is no evidence that Georgia-Pacific acted in bad faith.

Although Connecticut courts typically embrace the implied covenant of good faith and fair dealing in employment contracts, an at-will employee's eligibility to bring the claim, in the absence of specific express or implied contract terms, depends on proof that the allegedly improper discharge violated an important public policy. See Carbone, 204 Conn. at 471-72; Magnan, 193 Conn. at 572.  When she was hired, Owen understood her status as an at-will employee.[7]  Thus, because Owen has failed to establish any contract that would provide enhanced rights beyond at-will status and does not allege any violation of public policy, her claim for breach of the implied covenant of good faith and fair dealing fails.

Owen has failed to proffer sufficient evidence that Georgia-Pacific acted in bad faith.  Bad faith implies that one acts with a sinister purpose in the commission of fraud, deception, neglect, or the refusal to fulfill a duty or contractual obligation. See Franco, 238 F. Supp. 2d at 455 (citing Habetz v. Condon, 224 Conn. 231, 237 (1992)) (holding that in general, "bad

---

[7] When discussing her offer letter from Fort James for the position as Dixie product manager Owen admitted that she had read and understood that she or Fort James could discontinue her employment at any time, for any reason.  (See Dkt. # 31, Ex. A (Owen Dep.) at 45-46).  Furthermore, this status is reconfirmed in the Termination of Employment section of Georgia-Pacific's intranet.  (See Dkt. # 31, Ex. A, Ex. 11).

faith means more than mere negligence; it involves a dishonest purpose"). Owen alleges that Georgia-Pacific's failure to inform her of her poor performance constituted bad faith. This assertion fails because it depends on the presence of an actual implied contract to create such an obligation. The allegation also fails because even if the CTM document or TPM tool could suffice as an implied contract, Georgia-Pacific did, in fact, inform Owen of her poor behavior previous to her termination. Owen's poor performance was brought to her attention in performance evaluations given on July 28, 2000, December 31, 2000, and March 1, 2002. In each evaluation Grant warned Owen that she was sometimes aggressive and needed to control the problem to effectively work with others involved in product supply and sales. The March 2002 evaluation reads that this behavior has left her counterproductive and argumentative. Moreover, there are numerous emails which corroborate Grant's views. Accordingly, Georgia-Pacific's motion for summary judgment with respect to this claim contained in Count Four of the complaint is granted.

### E. NEGLIGENT HIRING

Finally, Georgia-Pacific contends that Owen's allegation that Grant was negligently hired is unsupported by the evidence. To prove a cause of action in negligent hiring, Owen must show that she was injured by Georgia-Pacific's negligence in failing

to hire a fit and competent employee to perform the job. See Roberts v. Circuit-Wise, Inc., 142 F. Supp. 2d 211, 214 (D. Conn. 2001); Shanks v. Walker, 116 F. Supp. 2d 311, 314 (D. Conn. 2000); Surowiec v. Security Forces, Inc., No. CV 95-0547875, 1995 WL 328362, at *4 (Conn. Super. Ct. May 23, 1995). The defendant has breached his or her duty to protect the plaintiff when plaintiff proves that the defendant knew or should have known of the employee's tendency to engage in the conduct that allegedly caused plaintiff's injury. See Shanks, 116 F. Supp. 2d at 314. Finally, the injuries plaintiff claims must arise from the unfit or incompetent work of the employee who is the subject of the plaintiff's claim. See Surowiec, 1995 WL 328362, at *4.

In her complaint, Owen alleges that Georgia-Pacific hired Grant knowing that he was unfit and incompetent to perform his job. (See Compl., ¶ 90). Owen, however, failed to present any evidence indicating that Grant was unfit to hire. Without submitting evidence that Grant was unfit or incompetent, Owen cannot prove that Georgia-Pacific should have known that hiring him would cause Owen harm. Accordingly, there is no genuine issue of material fact for a jury to decide, and judgment shall enter in favor of Georgia-Pacific this claim.

## IV. CONCLUSION

For the reasons stated herein, Georgia-Pacific's motion for summary judgment (dkt. # 29) is **GRANTED**; judgment shall enter in favor of Georgia-Pacific Corporation on all plaintiff's claims. The Clerk of the Court shall close this file.

So ordered this 26th day of August, 2005.

**/s/DJS**

_____
**DOMINIC J. SQUATRITO**
**UNITED STATES DISTRICT JUDGE**

-25-